# EXHIBIT A

COMPANY INFORMATION | PRESS RELEASES

# COMPANY PROFILE

SEC Filings

XBRL Content

Beneficial Ownership of Insiders

Corporate Governance

Executive Biographies

Company Profile

Stock Ticker

Press Releases

Contact RCI

### JOIN OUR NEWSLETTER

If you would like to receive all corporate news releases by email, send your request to ir@ricks.com. We'll make sure you are on the list. You can remove yourself at any time by clicking the "Unsubscribe" button at the bottom of these emails.

## Company Profile

### RCI Hospitality Holdings – Leader in gentlemen's clubs and bars/restaurants

- Founded in 1983, we pioneered elegant gentlemen's clubs based on powerful brands, quality environments, beautiful entertainers, and excellent restaurants.
- Since our IPO in 1995, we have used our expertise to transform RCI into a leading hospitality company.
- Today, subsidiaries own and operate more than 40 gentlemen's clubs, nightclubs and restaurant/bars.
- Larger units are in major cities, such as New York, Miami, Philadelphia, Dallas/Ft. Worth, and Minneapolis, with smaller ones spread through the South and Southwest.
- RCI also owns ED Publications, Inc., the leading media company serving the multi-billion dollar adult club business with industry-related websites, magazines and trade shows.
- Investors are attracted by RCI's strong cash flow, operating margins and local laws that create high barriers to entry in the adult club business.

### Key Strategies

- **Innovation:** RCI has extensive experience in gentlemen's club development, marketing, management, IT, and security. We know how to grow revenues and profits.
- **Roll Up:** There are 3,500 clubs that RCI would consider acquiring on a selected basis. Many owners plan to retire in the years ahead. With increasing access to financing, RCI can consolidate the industry, creating greater scale.
- **Bar/Restaurants:** RCI has begun leveraging its expertise, developing the rapidly-growing Bombshells chain of military themed bar/restaurants.
- **Robust:** RCI also is engaged in expanding distribution of Robust energy drinks to the on-premises market. Priced at 30-40% less than leading brands, Robust enables bars/restaurants to significantly expand margins.
- **Cash Flow:** RCI is focused on growing its considerable cash flow by expanding margins in its clubs and restaurants, and reducing expenses.
- **Buybacks:** With its growing cash flow, RCI has begun to buy back stock until it believes shares more adequately reflect core growth trends.

### Major Brands

- **Rick's Cabaret:** Elegant clubs with restaurants
- **Vivid Cabaret:** High-end, high-energy club for young professionals
- **Tootsie's Cabaret:** Nation's mega club with 74 thousand square feet
- **Club Onyx:** High-end clubs for African-American professionals
- **Jaguars Club:** Lively clubs for energy workers, primarily in Texas
- **XTC Cabaret:** Casual BYOB clubs for younger blue collar patrons, primarily in Texas
- **Bombshells:** Military themed, casual bar/restaurant for young professionals

### History of Innovation

Robert Watters founded the company in 1983 in Houston with the innovative Rick's Cabaret gentlemen's club concept. In 1998, the company merged with the XTC Cabaret chain, which was controlled by Eric Langan, who eventually became the company's president and CEO.

The early days as a publicly traded company (originally named Rick's Cabaret International, Inc.) were challenging. During the first 10 years, the stock fell more than half. Since then, shares have risen more than three fold.

Focusing on innovation, RCI has created a truly upscale, friendly chain of gentlemen's clubs for both

customers and entertainers, and built a substantial company through acquisition and internal growth.

"We brought our gentlemen's club concept to Manhattan in 2005 with Rick's Cabaret New York," said Mr. Langan. "Critics said it would never work. It did, and we did it again in 2014 with Vivid Cabaret New York aimed at younger professionals. Today, Rick's is considered the No. 1 club in the city and Vivid the hottest new club.

"Another example is the success of the Club Onyx concept, the first upscale gentlemen's clubs to cater to the African-American professional. It has attracted an enthusiastic clientele of professional athletes, musicians, businessmen, and community leaders.

"Now we are taking this spirit of innovation to closely related businesses. We have created the Bombshells bar/restaurant chain in Texas, which is attracting interest from individuals interested in franchises. We also are expanding the market reach of Robust energy drinks as a higher-margin, better tasting alternative for bars and restaurants."

## Eric Langan, President & CEO

- With more than two decades in the adult club industry, Eric Langan joined RCI in 1998 and has led the company since 1999.
- He acquired his first club in Texas at age 21 with $40,000 from the sale of his baseball card collection. Later, he acquired a controlling interest in RCI and became CEO, following its merger with his own publicly traded Taurus, Inc., which owned the XTC Cabaret chain.
- Under Mr. Langan's direction, RCI has grown both inside and outside of Texas, becoming the leading a consolidator in the gentlemen's club industry, as well as expanding the company into related businesses, such as bars/restaurants.
- Mr. Langan is a member of the Board of Directors of Adult Club Executives (ACE), the major trade organization for the gentlemen's club industry, and is considered an expert in the business.
- He grew up in Peoria, IL, where his father was a police officer. Later, the family moved to the Dallas area, where Eric began his entrepreneurial career. By age 16, he had developed his own advertising media company, distributing promotional flyers for local businesses.
- Mr. Langan believes the future of RCI lies in continued innovation in the hospitality industry by generating value in the adult club and related segments, with an emphasis on employing self-motivated, entrepreneurial managers; adhering to strict cost controls; focusing on increasing cash flow; and creating shareholder value.

## Did you know?

- Anna Nicole Smith met her oil billionaire husband while dancing at Rick's Cabaret
- Many performers at our clubs have become Penthouse Pets and Playboy Playmates
- Forbes lists RCI as one of America's 200 Best Small Companies
- RCI has been profiled in The Wall Street Journal, Fortune, MarketWatch, USA Today, New York Daily News and other publications
- Rick's Cabaret was named "Best Strip Club in NYC" by Playboy.com and our New York City Steakhouse is listed in Zagat's New York Nightlife and was included in the Time Out New York TONY 100 list of fine Manhattan dining establishments

© RCI Internet Services, Inc.. All Rights Reserved. Rick's, Onyx, Tootsies, Silvercity, XTC, Temptations, The Black Orchid are registered trademark of RCI Hospitality Holdings, Inc.

Webmaster | Contact

3/24/2016 12:51 PM

# EXHIBIT B



## RCI Hospitality's 1Q16 EPS Rebounds from 4Q15, Declares $0.03 Per Share Quarterly Dividend, to Open Third Club in New York City

HOUSTON – February 9, 2016 – RCI Hospitality Holdings, Inc. (Nasdaq: RICK) today announced results for the fiscal 2016 first quarter ended December 31, 2015, its first dividend, latest share buybacks, and plans to open a third gentlemen's club in Manhattan.

### 1Q16 Highlights

- GAAP and Non-GAAP* results rebounded from 4Q15, but were below the year ago record quarter in 1Q15.

- GAAP EPS was $0.25 fully diluted compared to $0.05 in 4Q15 and $0.32 in 1Q15.

- Non-GAAP EPS was $0.30 fully diluted compared to $0.17 in 4Q15 and $0.42 in 1Q15.

- Free cash flow (FCF) remained strong at $3.9 million compared to $5.0 million in 1Q15 and is on track to reach approximately $15-18 million in FY16. RCI defines FCF as operating cash flow less maintenance capex.

### Cash Dividend & Share Buy Backs

- Starting in 1Q16, the company stepped up its previously authorized share buyback program, taking advantage of its strong free cash flow to return capital to shareholders.

- In line with this program, RCI has declared a quarterly common stock dividend of $0.03 per share, or $0.12 per share annually. The declared dividend for the fiscal 2016 second quarter is payable on March 25, 2016, to holders of record on March 10, 2016, with an ex-dividend date of March 8, 2016.

- To date in FY16, the company has purchased 336,714 common shares at a cost of $3.3 million, reducing shares outstanding to 9.948 million at January 31, 2016 from 10.295 million a year ago.

### New Club in NYC

- An RCI subsidiary plans to open a sports-themed gentlemen's club in the Madison Square Garden area in the second half of FY16, to complement its highly successful Rick's Cabaret New York and Vivid Cabaret New York.

- The new club is being developed through a joint venture that requires only $1.5 million investment and is expected to generate a risk-adjusted after tax return better than buying back shares.

### Conference Call

A conference call to discuss these results, outlook and related matters will be held today at 4:30 PM ET:

- Dial In: 877-407-9210 (toll free) or 201-689-8049 (both domestic or international)

- Webcast URL: http://www.investorcalendar.com/IC/CEPage.asp?ID=174652

## Meet Management Tonight

Eric Langan, President & CEO, invites investors to meet management and tour one of the company's top clubs.

- When: Today, February 9, 2016, 6:00 PM to 8:00 PM ET

- Where: Rick's Cabaret New York, at 50 W. 33rd Street, between Fifth Avenue and Broadway

- RSVP: With your contact information to gary.fishman@anreder.com

## CEO Comment

"We are pleased we were nicely profitable in 1Q16 and generated strong free cash flow, but this was still very much a transition quarter," Mr. Langan said. "We have more work to do on costs and efficiencies. Our plan is to expand margins to grow profits and free cash flow on what we expect to be flattish revenues in 2016.

"While legal costs and settlements were still high, we are down to a handful of open insurance cases, and these expenses should begin to decline. With the 2Q16 acquisition of the Rick's Cabaret New York real estate, we anticipate further reductions in occupancy costs. We have initiated additional saving initiatives, which we anticipate will kick in in the upcoming quarters.

"We also have work to do to resume same store sales growth, but we have significant experience dealing with such situations. We have already begun to test new marketing strategies and tactics with success and are working on how to best implement them at other units. As part of this effort, we closed two gentlemen clubs in January for re-concepting and remodeling to what we believe will be a better use.  Both should reopen in March.

"Regarding new units, we have formed a joint venture to develop the first sports-themed gentlemen's club in Manhattan, which has been a great market for RCI. The new club only requires a relatively modest $1.5 million investment on our part.

"In addition, we are pleased to announce we are declaring a quarterly dividend of $0.03 per share and have begun to make a noticeable reduction in our share count to below 10 million. Our current intent is to continue to retire our shares until our stock, in our view, is more fully valued.

"We are dedicated to improving our valuation. With major legal issues behind us, we are free to use our superior cash generating power to return capital to shareholders by buying back shares and paying a dividend. While opportunities may arise, such as the new club announced today, we generally believe the best allocation of our capital is the risk-adjusted, after-tax, free cash flow yield of buying our own shares, versus acquiring or opening new units or paying down debt ahead of schedule, for as long as our stock stays at this low valuation relative to RCI's cash flow generation."

## 1Q16 Analysis (all comparisons to year ago periods unless otherwise noted)

### Total Revenues

- Total revenues of $33.5 million declined 2.1% or $0.7 million from $34.2 million in 1Q15, which was the second biggest revenue quarter in the last two years.

- Starting with 1Q16, total revenues (including prior periods) are being reported net of sales taxes and other revenue related taxes, RCI having chosen to early adopt new revenue accounting standards.

- There were 43 units in operation at the end of 1Q16, the same as at the end of 1Q15.

- Same store net sales totaled $30.0 million, down 6.3% or $2.0 million from $32.0 million. The decline reflected big spenders spending less per visit at some adult clubs, adult clubs located in energy producing areas in Texas coming down off their peak, and tough comparisons in the Bombshells segment due to strong initial sales at two units opened in late 4Q14 and in 1Q15.

- Units opened less than a year added approximately $2.3 million in total revenues. This included the November 2014 opening of Bombshells Houston-South, the January 2015 acquisition of Down in Texas Saloon in Austin, and the May 2015 acquisition of The Seville Club of Minneapolis.

- Liquor sales increased $0.6 million from both the nightclubs and Bombshells segments. Service revenues declined $0.9 million reflecting the spending trend at a number of adult clubs. Food and merchandise declined $0.5 million reflecting tough comparisons in the Bombshells segment.

## Operating Income & Margin

- GAAP income from operations was $5.7 million (17.1% of revenues) compared to $6.1 million (18.0%).
  - Operating income was generally lower due to reduced high-margin service revenues and slightly higher costs as the company's effort to expand margins has only just begun.

  - As part of this effort, rent declined 16.9%, partially offset by an increase in depreciation and amortization. This was the result of the August 2015 acquisition of the Miami Gardens Square retail plaza, where Tootsie's Cabaret Miami is located.

  - Legal and professional expenses increased 15.2% primarily due to work related to settlements leftover from RCI's prior insurance company. Actual settlement costs were $0.54 million compared to $0.25 million.

  - Operating income in 1Q15 was affected by a $1.4 million impairment related to the elimination of underperforming units.
- Non-GAAP income from operations was $6.6 million (19.7%) compared to $7.8 million (22.7%). RCI's standard non-GAAP operating income and margin calculations exclude some, but not all of the non-recurring expenses listed above.

## Occupancy Costs (Rent+Interest)

- Occupancy costs, which the company measures as a combination of rent plus interest expense, were 8.6% of revenues compared to 8.1% in the year ago quarter. The increase reflects a different mix of debt in the quarter, partially offset by the decline in rent.

- With the Rick's Cabaret New York real estate acquisition, RCI anticipates occupancy costs resuming their decline based on a significant drop in rent partially offset by an increase in interest.

- As previously announced, an RCI subsidiary in mid-January 2016 acquired the land and building where Rick's Cabaret New York is located for $10.0 million, financed through a 5.00% bank loan. Instead of $1.2 million annually in rent, there will be $0.5 million in interest, for an initial $0.7 million in cash savings.

## *Adjusted EBITDA & Free Cash Flow*

- RCI's cash generating power for the quarter, as reflected by adjusted EBITDA, amounted to $8.2 million compared to $9.7 million in the year ago period.

- As a result, RCI generated free cash flow of $3.9 million compared to $5.0 million and is on track to total approximately $15-18 million in FY16.

## *Nightclubs Segment*

- 38 units in operation at the end of the quarter, the same as a year ago.

- Sales declined 3.4%, to $28.2 million from $29.2 million.

- GAAP operating income was $8.5 million (30.2% of revenues) compared to $8.3 million (28.4%).

- Non-GAAP operating income, which excludes legal settlements and impairment of assets, was $9.1 million (32.1%) compared to $9.9 million (33.9%).

## *Bombshells Segment*

- Five units in operation at the end of the quarter, the same as a year ago.

- Sales declined 3.4%, to $4.4 million from $4.5 million.

- GAAP operating income was $0.48 million (11.1% of revenues) compared to $0.54 million (11.9%).

## *Balance Sheet (December 31, 2015 compared to September 30, 2015)*

·   Total stockholders' equity declined slightly to $128.2 million from $128.5 million as the company spent more to buy back shares than the increase in retained earnings.

## *Non-GAAP Financial Measures

In addition to our financial information presented in accordance with GAAP, management uses certain "non-GAAP financial measures" within the meaning of the SEC Regulation G, to clarify and enhance understanding of past performance and prospects for the future. Generally, a non-GAAP financial measure is a numerical measure of a company's operating performance, financial position or cash flows that excludes or includes amounts that are included in or excluded from the most directly comparable measure calculated and presented in accordance with GAAP. We monitor non-GAAP financial measures because it describes the operating performance of the company and helps management and investors gauge our ability to generate cash flow, excluding some non-recurring charges that are included in the most directly comparable measures calculated and presented in accordance with GAAP. Relative to each of the non-GAAP financial measures, we further set forth our rationale as follows:

·   *Non-GAAP Operating Income and Non-GAAP Operating Margin.* We exclude from

non-GAAP operating income and non-GAAP operating margin amortization of intangibles, gain on settlement of patron tax case, pre-opening costs, gains and losses from asset sales, gain on settlement of patron tax issue, impairment of assets, pre-opening costs, stock-based compensation charges, litigation and other one-time legal settlements and acquisition costs. We believe that excluding these items assists investors in evaluating period-over-period changes in our operating income and operating margin without the impact of items that are not a result of our day-to-day business and operations. While we were in litigation in the patron tax case, we also included patron taxes as an exclusion, but after settlement of the case, we no longer exclude patron taxes from operating income.

· *Non-GAAP Net Income and Non-GAAP Net Income per Basic Share and per Diluted Share.* We exclude from non-GAAP net income and non-GAAP net income per diluted share and per basic share amortization of intangibles, gain on settlement of patron tax case, pre-opening costs, income tax expense, impairment charges, gains and losses from asset sales, stock-based compensation, litigation and other one-time legal settlements, gain on contractual debt reduction and acquisition costs, and include the Non-GAAP provision for income taxes, calculated as the tax-effect at 35% effective tax rate of the pre-tax non-GAAP income before taxes less stock-based compensation, because we believe that excluding such measures helps management and investors better understand our operating activities. While we were in litigation in the patron tax case, we also included patron taxes as an exclusion, but after settlement of the case, we no longer exclude patron taxes from net income.

· *Adjusted EBITDA.* We exclude from Adjusted EBITDA depreciation expense, amortization of intangibles, income tax, interest expense, interest income, gains and losses from asset sales, pre-opening costs, acquisition costs, litigation and other one-time legal settlements, gain on settlement of patron tax case, gain on contractual debt reduction and impairment charges because we believe that adjusting for such items helps management and investors better understand operating activities. Adjusted EBITDA provides a core operational performance measurement that compares results without the need to adjust for Federal, state and local taxes which have considerable variation between domestic jurisdictions.  Also, we exclude interest cost in our calculation of Adjusted EBITDA. The results are, therefore, without consideration of financing alternatives of capital employed. We use Adjusted EBITDA as one guideline to assess our unleveraged performance return on our investments. Adjusted EBITDA is also the target benchmark for our acquisitions of nightclubs.

## About RCI Hospitality Holdings, Inc. (Nasdaq: RICK)

With 43 units, RCI Hospitality Holdings, Inc., through its subsidiaries, is the country's leading company in adult gentlemen clubs and sports bars/restaurants. Adult clubs in New York City, Miami, Philadelphia, Charlotte, Dallas/Ft. Worth, Houston, Minneapolis, Indianapolis and other cities operate under brand names, such as "Rick's Cabaret," "XTC," "Club Onyx," "Vivid Cabaret," "Jaguars" and "Tootsie's Cabaret." Sports bars/restaurants operate under the brand name "Bombshells." Please visit http://www.rcihospitality.com

## Forward-Looking Statements

This press release may contain forward-looking statements that involve a number of risks and uncertainties that could cause the company's actual results to differ materially from those indicated in this press release, including the risks and uncertainties associated with operating and managing an adult business, the business climates in cities where it operates, the success or lack

thereof in launching and building the company's businesses, risks and uncertainties related to the operational and financial results of its Web sites, conditions relevant to real estate transactions, and numerous other factors such as laws governing the operation of adult entertainment businesses, competition and dependence on key personnel. The company has no obligation to update or revise the forward-looking statements to reflect the occurrence of future events or circumstances.

## Media & Investor Contacts

Gary Fishman and Steven Anreder at 212-532-3232 or gary.fishman@anreder.com and steven.anreder@anreder.com

RCI HOSPITALITY HOLDINGS, INC.
CONSOLIDATED STATEMENTS OF INCOME

| (in thousands, except per share data) | Three Months Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| | (UNAUDITED) | |
| Revenues: | | |
| Sales of alcoholic beverages | $ 14,597 | $ 14,004 |
| Sales of food and merchandise | 4,334 | 4,834 |
| Service revenues | 12,641 | 13,528 |
| Other | 1,903 | 1,838 |
| Total revenues | 33,475 | 34,204 |
| | | |
| Operating expenses: | | |
| Cost of goods sold | 5,184 | 5,111 |
| Salaries and wages | 8,135 | 8,032 |
| Stock-based compensation | 120 | 120 |
| Other general and administrative: | | |
| Taxes and permits | 3,227 | 3,110 |
| Charge card fees | 613 | 547 |
| Rent | 948 | 1,141 |
| Legal and professional | 1,105 | 959 |
| Advertising and marketing | 1,305 | 1,367 |
| Depreciation and amortization | 1,817 | 1,645 |
| Insurance | 874 | 820 |
| Utilities | 710 | 734 |
| Impairment of assets | - | 1,358 |
| Settlement of lawsuits and other one-time costs | 540 | 247 |
| Other | 3,180 | 2,873 |
| Total operating expenses | 27,758 | 28,064 |
| Income from operations | 5,717 | 6,140 |
| Other income (expense): | | |
| Interest income and other | 4 | 13 |
| Interest expense | (1,915) | (1,619) |
| Gain from acquisition of controlling interest in subsidiary | - | 577 |
| Income before income taxes | 3,806 | 5,111 |
| Income taxes | 1,367 | 1,846 |
| Net income | 2,439 | 3,265 |
| Less: Net (income) loss attributable to noncontrolling interests | 113 | 95 |
| Net income attributable to RCI Hospitality Holdings, Inc. | $ 2,552 | $ 3,360 |
| Basic earnings per share attributable to RCIHH shareholders: | | |
| Net income | $ 0.25 | $ 0.33 |
| Diluted earnings per share attributable to RCIHH shareholders: | | |
| Net income | $ 0.25 | $ 0.32 |
| Weighted average number of common shares outstanding: | | |
| Basic | 10,296 | 10,264 |
| Diluted | 10,635 | 10,929 |

RCI HOSPITALITY HOLDINGS, INC.
NON-GAAP FINANCIAL MEASURES

| (in thousands, except per share data) | Three Months Ended December 31, | |
|---|---|---|
| | 2015 | 2014 |
| **Reconciliation of GAAP net income to Adjusted EBITDA** | | |
| GAAP net income | $2,552 | $3,360 |
| Income tax expense | 1,367 | 1,846 |
| Interest expense and income | 1,511 | 1,506 |
| Litigation and other one-time settlements | 540 | 247 |
| Impairment of assets | - | 1,358 |
| Pre-opening costs | - | 158 |
| Acquisition costs | - | 83 |
| Other | - | (577) |
| Depreciation and amortization | 1,817 | 1,645 |
| Adjusted EBITDA | 58,187 | 59,725 |
| | | |
| **Reconciliation of GAAP net income (loss) to non-GAAP net income** | | |
| GAAP net income | $2,552 | $3,360 |
| Amortization of intangibles | 202 | 244 |
| Stock-based compensation | 120 | 120 |
| Litigation and other one-time settlements | 540 | 247 |
| Impairment of assets | - | 1,358 |
| Income tax expense | 1,367 | 1,846 |
| Pre-opening costs | - | 158 |
| Acquisition costs | - | 83 |
| Other | - | (577) |
| Non-GAAP provision for income taxes | (1,673) | (2,394) |
| Non-GAAP net income | 53,108 | 54,445 |
| | | |
| **Reconciliation of GAAP diluted net income per share to non-GAAP diluted net income per share** | | |
| Fully diluted shares | 10,635 | 10,929 |
| GAAP net income | $0.25 | $0.32 |
| Amortization of intangibles | 0.02 | 0.02 |
| Stock-based compensation | 0.01 | 0.01 |
| Litigation and other one-time settlements | 0.05 | 0.02 |
| Impairment of assets | - | 0.12 |
| Income tax expense | 0.13 | 0.17 |
| Pre-opening costs | - | 0.01 |
| Acquisition costs | - | 0.01 |
| Other | - | (0.05) |
| Non-GAAP provision for income taxes | (0.16) | (0.22) |
| Non-GAAP diluted net income per share | $0.30 | $0.42 |
| | | |
| **Reconciliation of GAAP operating income to non-GAAP operating income** | | |
| GAAP operating income | $5,717 | $6,140 |
| Amortization of intangibles | 202 | 244 |
| Stock-based compensation | 120 | 120 |
| Litigation and other one-time settlements | 540 | 247 |
| Impairment of assets | - | 1,358 |
| Other | - | (577) |
| Pre-opening costs | - | 158 |
| Acquisition costs | - | 83 |
| Non-GAAP operating income | 56,579 | 57,773 |
| | | |
| **Reconciliation of GAAP operating margin to non-GAAP operating margin** | | |
| GAAP operating income | 17.1% | 18.0% |
| Amortization of intangibles | 0.6% | 0.7% |
| Stock-based compensation | 0.4% | 0.4% |
| Litigation and other one-time settlements | 1.6% | 0.7% |
| Impairment of assets | 0.0% | 4.0% |
| Loss on sale of property and other | 0.0% | -1.7% |
| Pre-opening costs | 0.0% | 0.5% |
| Acquisition costs | 0.0% | 0.2% |
| Non-GAAP operating margin | 19.7% | 22.7% |

RCI HOSPITALITY HOLDINGS, INC.
SEGMENT INFORMATION

| (in thousands) | Three Months Ended December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Business segment revenues: | | |
| Nightclubs | $ 28,170 | $ 29,167 |
| Bombshells | 4,379 | 4,534 |
| Other | 926 | 503 |
| | $ 33,475 | $ 34,204 |
| Business segment operating income (loss): | | |
| Nightclubs | $ 8,508 | $ 8,284 |
| Bombshells | 487 | 539 |
| Other | (648) | (546) |
| General corporate | (2,630) | (2,137) |
| | $ 5,717 | $ 6,140 |
| Reconciliation of Nightclubs GAAP operating income to non-GAAP operating income | | |
| Nightclubs operating income | $ 8,508 | $ 8,284 |
| Impairment of assets | - | 1,358 |
| Litigation and other one-time settlements | 540 | 247 |
| Nightclubs non-GAAP operating income | $ 9,048 | $ 9,889 |
| Nightclubs non-GAAP operating margin | 32.1% | 33.9% |

# EXHIBIT B-1

10-K 1 v425818_10k.htm 10-K

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

x      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended September 30, 2015

¨      Transition report under Section 13 or 15(d) of the Securities Exchange Act of 1934

Commission file number: 001-13992

### RCI HOSPITALITY HOLDINGS, INC.
(Exact name of registrant as specified in its charter)

**Texas**
State or other jurisdiction of (I.R.S. Employer incorporation or organization Identification No.)

**10959 Cutten Road, Houston, Texas 77066**
(Address of principal executive offices)

**(281) 397-6730**
Registrant's telephone number, including area code

Securities registered pursuant to Section 12(b) of the Act:

**Common Stock, $.01 Par Value**
(Title of class)

**NASDAQ Stock Market LLC**
Name of each exchange on which registered

Securities registered pursuant to section 12(g) of the Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ¨  No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ¨  No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes x  No ¨

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes x  No ¨

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ¨

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.   Large accelerated filer ¨   Accelerated filer x   Non-accelerated filer ¨  Smaller reporting company ¨

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.): Yes ¨  No x

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold as of the last business day of the registrant's most recently completed second fiscal quarter was $92,038,213.

As of December 1, 2015, there were approximately 10,192,935 shares of common stock outstanding.

## NOTE ABOUT FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements include, among other things, statements regarding plans, objectives, goals, strategies, future events or performance and underlying assumptions and other statements, which are other than statements of historical facts. Forward-looking statements may appear throughout this report, including without limitation, the following sections: Item 1 "Business," Item 1A "Risk Factors," and Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements generally can be identified by words such as "anticipates," "believes," "estimates," "expects," "intends," "plans," "predicts," "projects," "will be," "will continue," "will likely result," and similar expressions. These forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties, which could cause our actual results to differ materially from those reflected in the forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in this Annual Report on Form 10-K, and in particular, the risks discussed under the caption "Risk Factors" in Item 1A and those discussed in other documents we file with the Securities and Exchange Commission (SEC). Important factors that in our view could cause material adverse affects on our financial condition and results of operations include, but are not limited to, the risks and uncertainties related to our future operational and financial results, competitive factors, the timing of the openings of other units, the availability of acceptable financing to fund corporate expansion efforts, our dependence on key personnel, the ability to manage operations and the future operational strength of management, and the laws governing the operation of adult entertainment businesses. We undertake no obligation to revise or publicly release the results of any revision to any forward-looking statements, except as required by law. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.

2

## TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 8 |
| Item 1B. | Unresolved Staff Comments | 12 |
| Item 2. | Properties | 12 |
| Item 3. | Legal Proceedings | 12 |
| Item 4. | Mine Safety Disclosures | 12 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases Of Equity Securities | 13 |
| Item 6. | Selected Financial Data | 15 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 15 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 26 |
| Item 8. | Financial Statements and Supplementary Data | 26 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosures | 60 |
| Item 9A. | Controls and Procedures | 60 |
| Item 9B. | Other Information | 60 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 60 |
| Item 11. | Executive Compensation | 62 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 67 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 68 |
| Item 14. | Principal Accounting Fees and Services | 68 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 69 |
| | Signatures | 70 |

3

## PART I

**Item 1. Business.**

### INTRODUCTION

At the Company's Annual Meeting of Stockholders on August 6, 2014, its name was officially changed from Rick's Cabaret International, Inc. to RCI Hospitality Holdings, Inc. RCI Hospitality Holdings, Inc. (sometimes referred to as RCIHH herein) was incorporated in the State of Texas in 1994. Through our subsidiaries, as of November 30, 2015, we operate a total of forty-three establishments that offer live adult entertainment, and/or restaurant and bar operations.   We have two reportable segments; nightclubs and Bombshells Restaurants and Bars. RCI Hospitality Holdings, Inc. is a holding company and operates through its subsidiaries including its management company, RCI Management Services, Inc. All services and management operations are conducted by subsidiaries of RCI Hospitality Holdings, Inc. In the context of club and bar/restaurant operations, the terms the "Company," "we," "our," "us" and similar terms used in this Form 10-K refer to subsidiaries of RCI Hospitality Holdings, Inc. Excepting executive officers of RCI Hospitality Holdings, Inc., any employment referenced in this document is not with RCI Hospitality Holdings, Inc. but solely with one of its subsidiaries.

### SCHEDULE OF UNITS

| Name of Establishment | Date Acquired/Opened |
|---|---|
| Club Onyx, Houston, TX | 1995 |
| Rick's Cabaret, Minneapolis, MN | 1998 |
| XTC Cabaret, Austin, TX | 1998 |
| XTC Cabaret, San Antonio, TX | 1998 |
| XTC Cabaret, Houston, TX | 2004 |
| Rick's Cabaret, New York City, NY | 2005 |
| Club Onyx, Charlotte, NC | 2005 |
| Rick's Cabaret, San Antonio, TX | 2006 |
| XTC Cabaret, South Houston, TX | 2006 |
| Rick's Cabaret, Fort Worth, TX | 2007 |
| Tootsie's Cabaret, Miami Gardens, FL | 2008 |
| XTC Cabaret, Dallas, TX | 2008 |
| Club Onyx, Dallas, TX | 2008 |
| Club Onyx, Philadelphia, PA | 2008 |
| Rick's Cabaret, Round Rock, TX | 2009 |
| Cabaret North, Fort Worth, TX | 2009 |
| Cabaret East, Fort Worth, TX | 2010 |
| Rick's Cabaret DFW, Fort Worth, TX | 2011 |
| Downtown Cabaret, Minneapolis, MN | 2011 |
| Rick's Cabaret, Indianapolis, IN | 2011 |
| Temptations, Aledo, TX | 2011 |
| Silver City Cabaret, Dallas, TX | 2012 |
| Jaguars Club, Odessa, TX | 2012 |
| Jaguars Club, Phoenix, AZ | 2012 |
| Jaguars Club, Lubbock, TX | 2012 |
| Jaguars Club, Longview, TX | 2012 |
| Jaguars Club, Tye, TX | 2012 |
| Jaguars Club, Edinburg, TX | 2012 |
| Jaguars Club, El Paso, TX | 2012 |
| Jaguars Club, Harlingen, TX | 2012 |
| Vee Lounge, Fort Worth, TX | 2013 |
| Bombshells, Dallas, TX | 2013 |
| Temptations, Sulphur, LA | 2013 |
| Temptations, Beaumont, TX | 2013 |
| Bombshells, Webster, TX | 2013 |
| The Black Orchid, Dallas, TX | 2013 |
| Vivid Cabaret, New York, NY | 2014 |
| Bombshells, Austin, TX | 2014 |
| Rick's Cabaret, Odessa, TX | 2014 |
| Bombshells, Spring TX | 2014 |
| Bombshells, Houston, TX | 2014 |
| Down in Texas Saloon, Austin TX | 2015 |
| The Seville, Minneapolis MN | 2015 |

4

Our website address is www.rcihospitality.com.   Upon written request, we make available free of charge our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with the SEC under the Securities Exchange Act of 1934, as amended. Information contained in the website shall not be construed as part of this Form 10-K.

## BUSINESS ACTIVITIES—NIGHTCLUBS

Prior to the opening of the first Rick's Cabaret in 1983 in Houston, Texas, the adult entertainment nightclub business was characterized by small establishments generally managed by their owner. Operating policies of these establishments were often lax, the sites were generally dimly lit, standards for performers' personal appearance and personality were not maintained and it was customary for performers to alternate between dancing and waiting tables. The quantity and quality of bar service was low and food was not frequently offered. Music was usually "hard" rock and roll, played at a loud level by a disc jockey. Usually, only cash was accepted. Many businessmen felt uncomfortable in such environments. Recognizing a void in the market for a first-class adult nightclub, we designed Rick's Cabaret to target the more affluent customer by providing a unique quality entertainment environment. In addition we have continued to develop additional brands targeting specific markets and demographics to maximize the business opportunities at these locations. The following summarizes our areas of operation that distinguish us:

Female Entertainers . Our policy is to maintain high standards for both personal appearance and personality for the entertainers and waitresses. Of equal importance is a performer's ability to present herself attractively and to engage in conversation with customers. We prefer that performers who work at our clubs be experienced entertainers. We make a determination as to whether a particular entertainer is suitable based on such factors of appearance, attitude, dress, communication skills and demeanor. At all clubs, except for our Rick's Minnesota location, the entertainers are independent contractors. We do not schedule their work hours.

Management . We often recruit staff from inside the adult entertainment industry, as well as from large restaurant and club chains, in the belief that management with experience in the sector adds to our ability to grow and attract quality entertainers as well as clientele. Management with experience is able to train new recruits from outside the industry.

Compliance Policies/Employees . We have a policy of ensuring that our businesses are operated in conformity with local, state and federal laws. We continually monitor the behavior of employees and customers to ensure that proper standards of behavior are observed.

Compliance Policies/Credit Cards . We have in place policies requiring that certain credit card charges must be approved, in writing, by management before any charges are accepted.  Management is trained to review credit card charges to ensure that the only charges approved for payment are for food, drink, merchandise and entertainment.

Food and Drink . We believe that a key to the success of our branded adult nightclubs is a quality, first-class bar and restaurant operation to complement our adult entertainment. We employ service managers who recruit and train professional wait staff and ensure that each customer receives prompt and courteous service. We employ chefs with restaurant experience. Our bar managers order inventory and schedule bar staff. We believe that the operation of a first class restaurant is a necessary component to the operation of a premiere adult cabaret, as is the provision of premium wine, liquor and beer in order to ensure that the customer perceives and obtains good value. At most locations, our restaurant operations provide business lunch buffets and full lunch and dinner menu service with hot and cold appetizers, salads, seafood, steak, and lobster. An extensive selection of quality wines is available at most locations.

Controls . Operational and accounting controls are essential to the successful operation of a cash intensive nightclub and bar business. At each location, we have designed and implemented internal procedures and controls to ensure the integrity of our operational and accounting records. Wherever practicable, we separate management personnel from all cash handling so that management is isolated from and does not handle any cash. We use a combination of accounting and physical inventory control mechanisms to maintain a high level of integrity in our accounting practices. Information technology plays a significant role in capturing and analyzing a variety of information to provide management with the information necessary to efficiently manage and control each nightclub. Deposits of cash and credit card receipts are reconciled each day to a daily income report. In addition, we review on a daily basis (i) cash and credit card summaries which tie together all cash and credit card transactions occurring at the front door, the bars in the club and the cashier station, (ii) a summary of the daily bartenders' check-out reports, and (iii) a daily cash requirements analysis which reconciles the previous day's cash on hand to the requirements for the next day's operations. These daily computer reports alert local management of any variances from expected financial results based on historical norms. We conduct a monthly overview of our financial condition and operating results.

Atmosphere . We maintain a high design standard in our facilities and decor. The furniture and furnishings in the nightclubs create the feeling of an upscale restaurant. The sound system provides quality sound at levels at which conversations can still take place. The environment is carefully monitored for music selection, entertainer and waitress appearance and all aspects of customer service on a continuous basis.

5

VIP Room . In keeping with our emphasis on serving the upper-end of the businessmen's market, some of our nightclubs include a VIP room, which provides a higher level of service and luxury.

Advertising and Promotion . Our consumer marketing strategy is to position our brands as premiere entertainment facilities that provide exceptional adult entertainment in a fun, yet discreet, environment. We use a variety of highly targeted methods to reach our customers including hotel publications, local radio, cable television, newspapers, billboards, taxi-cab reader boards, and the Internet, as well as a variety of promotional campaigns. These campaigns ensure that our brand names are kept before the public.

RCI Hospitality Holdings, Inc. has received a significant amount of media exposure over the years in national magazines such as *Playboy*, *Penthouse*, *Glamour Magazine*, *The Ladies Home Journal*, *Time Magazine*, *Time Out New York*, and *Texas Monthly Magazine*. Segments about RCIHH have aired on national and local television programs such as "20/20", "Extra" and "Inside Edition", and we have provided entertainers for pay-per-view features as well. Business stories about RCI Hospitality Holdings, Inc. have appeared in *Forbes*, *Newsweek*, *The Wall Street Journal*, *The New York Times*, *The New York Post*, *Los Angeles Times*, *Houston Business Journal*, and numerous other national and regional publications. RCI Hospitality Holdings, Inc. has been profiled in *The Wall Street Journal*, *Fortune*, *MarketWatch* , *Corporate Board Member*, *Smart Money*, *USA Today*, *The New York Daily News* and other publications.

## NIGHTCLUB LOCATIONS

We currently operate units under the name "Rick's Cabaret" in San Antonio, Austin, Odessa and Fort Worth, Texas (2); Minneapolis, Minnesota; New York, New York; and Indianapolis, Indiana. We also operate a similar nightclub under the name "Tootsie's Cabaret" in Miami Gardens, Florida. We operate a total of four nightclubs (one in Houston, one in Dallas, one in Charlotte, North Carolina and one in Philadelphia, Pennsylvania), as "Club Onyx", upscale venues that welcome all customers but cater especially to urban professionals, businessmen and professional athletes. Additionally, we own five nightclubs that operate as "XTC Cabaret" in San Antonio, Austin, Dallas, Houston and South Houston, Texas, one that operates as "Cabaret East" in Fort Worth, one that operates as "Cabaret North" in Fort Worth, one that operates as Silver City in Dallas and one that operates as "Downtown Cabaret" in Minneapolis.  We operate "Temptations" clubs in Sulphur, Louisiana, Beaumont, Texas and Fort Worth, Texas.  We operate eight clubs as "Jaguars" in Texas and one in Phoenix, Arizona. We operate The Black Orchid in Dallas, Texas. We operate the "Seville" in Minneapolis, Minnesota. We also operate the "Down in Texas Saloon" in Austin, Texas. We sold our New Orleans, Louisiana nightclub in March 1999, but it continues to use the name "Rick's Cabaret" under a licensing agreement.

## RECENT TRANSACTIONS

See Note M, Acquisitions, of Notes to Consolidated Financial Statements for acquisitions during fiscal years ended September 30, 2015, 2014 and 2013.

## BUSINESS ACTIVITIES – SPORTS BARS/RESTAURANTS

We also operate five sports bar/restaurants as "Bombshells" in Dallas, Austin and Houston, Texas. Our subsidiary, BMB Franchising Services, Inc. recently announced that it is beginning a nationwide franchising program for Bombshells. The restaurant sets itself apart with décor that pays homage to all branches of the U.S. military, live music by popular local bands, large outdoor patios, and more than 75 state of the art flat screen TVs for watching your favorite sports. All food and drink menu items have military names. Bombshell Girls, with their military-inspired uniforms, are a key attraction. Their mission, in addition to waitressing, is to interact with guests and generate a fun atmosphere. The first Bombshells opened March 2013 in Dallas, quickly becoming one of the most popular restaurant destinations in the area. Within a year, four more opened in Austin and Houston. Of the five, three are freestanding pad sites and two are inline locations. In addition, we currently operate a bar in Fort Worth, Texas as Vee Lounge.

## BUSINESS ACTIVITIES – MEDIA GROUP

The Media Group, made up of wholly owned subsidiaries, is the leading business communications company serving the multi-billion-dollar adult nightclubs industry. It owns a national industry convention and tradeshow; two national industry trade publications; two national industry awards shows; and more than 25 industry websites. Included in the Media Group is ED Publications, publishers of the bimonthly ED Club Bulletin, the only national business magazine serving the 3,500-plus adult nightclubs in North America, which have annual revenues in excess of $5 billion, according to the Association of Club Executives. ED Publications, founded in 1991, also publishes the Annual VIP Guide of adult nightclubs, touring entertainers and industry vendors; produces the Annual Gentlemen's Club Owners EXPO, a national convention and tradeshow which marked its 20-Year Anniversary in 2012; and offers the exclusive ED VIP Club Card, honored at more than 850 adult nightclubs. Also in the Media Group is Storerotica, founded in 2004, which publishes the bimonthly Storerotica Magazine, the industry trade publication for the multi-billion-dollar erotic apparel and adult novelty retail sales industries. The Media Group produces two nationally recognized industry awards show for the readers of both ED Club Bulletin and Storerotica magazines, and maintains a number of B-to-B and consumer websites for both industries.

## BUSINESS ACTIVITIES – ENERGY DRINKS

In October 2014, we formed a new subsidiary with exclusive distribution rights to Robust brand energy drinks in North America. Robust is a fast growing brand targeting the on premises bar and mixer market in eight states. The new subsidiary, of which RCIHH owns 51%, acquired certain assets and liabilities of Robust Energy LLC of Dallas. RCI paid $200,000 in cash and issued 200,000 shares of common stock to Robust Energy's two founders. The new subsidiary's exclusive rights are for 10 years, with rights to renew, with Sun Mark Limited of the UK, which has been manufacturing and distributing the drink under the Bullet brand there since 2008. Robust comes in standard 8.4 ounce energy drink cans and in four flavors: regular, sugar free, cranberry and lemon mint, which mixes particularly well with whiskey and tequila.

## COMPETITION

The adult entertainment and the restaurant/bar businesses are highly competitive with respect to price, service and location. All of our nightclubs compete with a number of locally owned adult clubs, some of whose names may have name recognition that equals that of ours. While there may be restrictions on the location of a so-called "sexually oriented business"(SOB), there are low barriers to entry into the adult cabaret entertainment market. The names "Rick's" and "Rick's Cabaret", "Tootsie's Cabaret", "XTC Cabaret", "Silver City", "Club Onyx" "Downtown Cabaret", "Temptations," "The Black Orchid," "The Seville," "Jaguars," and "Down in Texas" are proprietary. In the restaurant/bar business, "Bombshells" is also proprietary. We believe that the combination of our existing brand name recognition and the distinctive entertainment environment that we have created will allow us to compete effectively in the industry and within the cities where we operate. Although we believe that we are well positioned to compete successfully, there can be no assurance that we will be able to maintain our high level of name recognition and prestige within the marketplace.

## GOVERNMENTAL REGULATIONS

We are subject to various federal, state and local laws affecting our business activities. In particular, in Texas the authority to issue a permit to sell alcoholic beverages is governed by the Texas Alcoholic Beverage Commission ("TABC"), which has the authority, in its discretion, to issue the appropriate permits. We presently hold a Mixed Beverage Permit and a Late Hour Permit at numerous Texas locations. Minnesota, North Carolina, Indiana, Louisiana, Arizona, Pennsylvania, Florida, and New York have similar laws that may limit the availability of a permit to sell alcoholic beverages or that may provide for suspension or revocation of a permit to sell alcoholic beverages in certain circumstances. It is our policy, prior to expanding into any new market, to take steps to ensure compliance with all licensing and regulatory requirements for the sale of alcoholic beverages as well as the sale of food.

In addition to various regulatory requirements affecting the sale of alcoholic beverages, in many cities where we operate, the location of an adult entertainment cabaret is subject to restriction by city ordinance. The prohibitions deal generally with distance from schools, churches, and other sexually oriented businesses and contain restrictions based on the percentage of residences within the immediate vicinity of the sexually oriented business. The granting of a Sexually Oriented Business Permit is not subject to discretion; the Business Permit must be granted if the proposed operation satisfies the requirements of the Ordinance. In all states where we operate, management believes we are in compliance with applicable city, county, state or other local laws governing the sale of alcohol and sexually oriented businesses.

## TRADEMARKS

Our rights to the tradenames "RCI Hospitality Holdings, Inc.", "Rick's", "Rick's Cabaret", "Tootsie's Cabaret", "Club Onyx," "XTC Cabaret," "Temptations," "Jaguars," "Downtown Cabaret," "Cabaret East," Cabaret North," Bombshells," "Vee Lounge" and "The Black Orchid" are established under common law, based upon our substantial and continuous use of these tradenames in interstate commerce, some of which have been in use at least as early as 1987. We have registered our service mark, "RICK'S AND STARS DESIGN", with the United States Patent and Trademark Office. We have also obtained service mark registrations from the Patent and Trademark Office for the "RCI HOSPITALITY HOLDINGS, INC.", "RICK'S", "RICK'S CABARET", "CLUB ONYX", "XTC CABARET", "SILVER CITY CABARET", "THE BLACK ORCHID", "BOMBSHELLS" and "EXOTIC DANCER" service marks. As of this date we have pending registration applications for the names "THE SEVILLE" and "DOWN IN TEXAS SALOON". "We also own the rights to numerous tradenames associated with our media division. There can be no assurance that the steps we have taken to protect our service marks will be adequate to deter misappropriation.

## EMPLOYEES AND INDEPENDENT CONTRACTORS

As of September 30, 2015, we and our subsidiaries had approximately 2,150 employees, of which approximately 150 are in management positions, including corporate and administrative operations and approximately 2,000 are engaged in entertainment, food and beverage service, including bartenders, waitresses, and certain entertainers. None of our employees are represented by a union. We consider our employee relations to be good. Additionally, as of September 30, 2015, we had independent contractor relationships with certain entertainers, who are self-employed and conduct business at our locations on a non-exclusive basis as independent contractors. Our entertainers at Rick's Cabaret in Minneapolis, Minnesota act as commissioned employees. We believe that the adult entertainment industry standard of treating entertainers as independent contractors provides us with safe harbor protection to preclude payroll tax assessment for prior years. We have prepared plans that we believe will protect our profitability in the event that the sexually oriented business industry is required in all states to convert entertainers who are now independent contractors into employees.

## SHARE REPURCHASES

On September 29, 2008, our Board of Directors authorized us to repurchase up to $5 million worth of our common stock in the open market. As of April 2013, we completed the repurchase of all $5 million in stock authorized under this plan. On April 25, 2013, our Board of Directors authorized us to repurchase up to an additional $3 million worth of our common stock in the open market or in privately negotiated transactions. During May 2014, our Board of Directors increased the repurchase authorization to $10 million. During the fiscal year ended September 30, 2015, we purchased 225,280 shares of common stock in the open market at prices ranging from $9.24 to $11.95, and during the fiscal year ended September 30, 2014, we purchased 101,330 shares of common stock in the open market at prices ranging from $10.45 to $12.00 and under the Board's authority, we have $6.6 million remaining to purchase additional shares as of September 30, 2015.

3/25/2016 1:11 PM

**Item 1A. Risk Factors.**

An investment in our common stock involves a high degree of risk. You should carefully consider the risks described below before deciding to purchase shares of our common stock. If any of the events, contingencies, circumstances or conditions described in the risks below actually occurs, our business, financial condition or results of operations could be seriously harmed. The trading price of our common stock could, in turn, decline and you could lose all or part of your investment.

<u>Our Business Operations are Subject to Regulatory Uncertainties Which May Affect Our Ability to Continue Operations of Existing Nightclubs, Acquire Additional Nightclubs or Be Profitable</u>

Adult entertainment nightclubs are subject to local, state and federal regulations. Our business is regulated by local zoning, local and state liquor licensing, local ordinances and state and federal time place and manner restrictions. The adult entertainment provided by our nightclubs has elements of speech and expression and, therefore, enjoys some protection under the First Amendment to the United States Constitution. However, the protection is limited to the expression, and not the conduct of an entertainer. While our nightclubs are generally well established in their respective markets, there can be no assurance that local, state and/or federal licensing and other regulations will permit our nightclubs to remain in operation or profitable in the future.

<u>Our Business has been, and may Continue to be, Adversely Affected by Conditions in the U.S. Financial Markets and Economic Conditions Generally</u>

Our nightclubs are often acquired with a purchase price based on historical EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization). This results in certain nightclubs carrying a substantial amount of intangible value, mostly allocated to licenses and goodwill. Generally accepted accounting principles require an annual impairment review of these indefinite lived assets. If difficult market and economic conditions continue over the next year and/or we experience a decrease in revenue at one or more nightclubs, we could incur a decline in fair value of one or more of our nightclubs. This could result in future impairment charges of up to the total value of the indefinite lived intangible assets.

<u>We May Need Additional Financing or Our Business Expansion Plans May Be Significantly Limited</u>

If cash generated from our operations is insufficient to satisfy our working capital and capital expenditure requirements, we will need to raise additional funds through the public or private sale of our equity or debt securities. The timing and amount of our capital requirements will depend on a number of factors, including cash flow and cash requirements for nightclub acquisitions. If additional funds are raised through the issuance of equity or convertible debt securities, the percentage ownership of our then-existing shareholders will be reduced. We cannot assure you that additional financing will be available on terms favorable to us, if at all. Any future equity financing, if available, may result in dilution to existing shareholders, and debt financing, if available, may include restrictive covenants. Any failure by us to procure timely additional financing will have material adverse consequences on our business operations.

<u>There is Substantial Competition in the Nightclub Entertainment Industry, Which May Affect Our Ability to Operate Profitably or Acquire Additional Clubs</u>

Our nightclubs face competition. Some of these competitors may have greater financial and management resources than we do. Additionally, the industry is subject to unpredictable competitive trends and competition for general entertainment dollars. There can be no assurance that we will be able to remain profitable in this competitive industry.

<u>Risk of Adult Nightclubs Operations</u>

Historically, the adult entertainment, restaurant and bar industry has been an extremely volatile industry. The industry tends to be extremely sensitive to the general local economy, in that when economic conditions are prosperous, entertainment industry revenues increase, and when economic conditions are unfavorable, entertainment industry revenues decline. Coupled with this economic sensitivity are the trendy personal preferences of the customers who frequent adult cabarets. We continuously monitor trends in our customers' tastes and entertainment preferences so that, if necessary, we can make appropriate changes which will allow us to remain one of the premiere adult cabarets. However, any significant decline in general corporate conditions or uncertainties regarding future economic prospects that affect consumer spending could have a material adverse effect on our business. In addition, we have historically catered to a clientele base from the upper end of the market. Accordingly, further reductions in the amounts of entertainment expenses allowed as deductions from income under the Internal Revenue Code of 1954, as amended, could adversely affect sales to customers dependent upon corporate expense accounts.

8

Permits Relating to the Sale of Alcohol

We derive a significant portion of our revenues from the sale of alcoholic beverages. States in which we operate may have laws which may limit the availability of a permit to sell alcoholic beverages or which may provide for suspension or revocation of a permit to sell alcoholic beverages in certain circumstances. The temporary or permanent suspension or revocations of any such permits would have a material adverse effect on our revenues, financial condition and results of operations. In all states where we operate, management believes we are in compliance with applicable city, county, state or other local laws governing the sale of alcohol.

Activities or Conduct at Our Nightclubs May Cause Us to Lose Necessary Business Licenses, Expose Us to Liability, or Result in Adverse Publicity, Which May Increase Our Costs and Divert Management's Attention from Our Business

We are subject to risks associated with activities or conduct at our nightclubs that are illegal or violate the terms of necessary business licenses. Some of our nightclubs operate under licenses for sexually oriented businesses and are afforded some protection under the First Amendment to the U.S. Constitution. While we believe that the activities at our nightclubs comply with the terms of such licenses, and that the element of our business that constitutes an expression of free speech under the First Amendment to the U.S. Constitution is protected, activities and conduct at our nightclubs may be found to violate the terms of such licenses or be unprotected under the U.S. Constitution. This protection is limited to the expression and not the conduct of an entertainer. An issuing authority may suspend or terminate a license for a nightclub found to have violated the license terms. Illegal activities or conduct at any of our nightclubs may result in negative publicity or litigation. Such consequences may increase our cost of doing business, divert management's attention from our business and make an investment in our securities unattractive to current and potential investors, thereby lowering our profitability and our stock price.

We have developed comprehensive policies aimed at ensuring that the operation of each nightclub is conducted in conformance with local, state and federal laws. We have a "no tolerance" policy on illegal drug use in or around the facilities. We continually monitor the actions of entertainers, waitresses and customers to ensure that proper behavior standards are met. However, such policies, no matter how well designed and enforced, can provide only reasonable, not absolute, assurance that the policies' objectives are being achieved. Because of the inherent limitations in all control systems and policies, there can be no assurance that our policies will prevent deliberate acts by persons attempting to violate or circumvent them. Notwithstanding the foregoing limitations, management believes that our policies are reasonably effective in achieving their purposes.

Our Acquisitions May Result in Disruptions in Our Business and Diversion of Management's Attention

We have made and may continue to make acquisitions of complementary nightclubs, restaurants or related operations. Any acquisitions will require the integration of the operations, products and personnel of the acquired businesses and the training and motivation of these individuals. Such acquisitions may disrupt our operations and divert management's attention from day-to-day operations, which could impair our relationships with current employees, customers and partners. We may also incur debt or issue equity securities to pay for any future acquisitions. These issuances could be substantially dilutive to our stockholders. In addition, our profitability may suffer because of acquisition-related costs or amortization, or impairment costs for acquired goodwill and other intangible assets. If management is unable to fully integrate acquired business, products or persons with existing operations, we may not receive the benefits of the acquisitions, and our revenues and stock trading price may decrease.

We Must Continue to Meet NASDAQ Global Market Continued Listing Requirements or We Risk Delisting

Our securities are currently listed for trading on the NASDAQ Global Market. We must continue to satisfy NASDAQ's continued listing requirements or risk delisting which would have an adverse effect on our business. If our securities are ever de-listed from NASDAQ, they may trade on the over-the-counter market, which may be a less liquid market. In such case, our shareholders' ability to trade or obtain quotations of the market value of shares of our common stock would be severely limited because of lower trading volumes and transaction delays. These factors could contribute to lower prices and larger spreads in the bid and ask prices for our securities. There is no assurance that we will be able to maintain compliance with the NASDAQ continued listing requirements.

We Incur Significant Costs as a Result of Operating as a Public Company, and Our Management Devotes Substantial Time to New Compliance Initiatives

We will incur significant legal, accounting and other expenses that our competition does not incur. The Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), as well as new rules subsequently implemented by the SEC, have imposed various requirements on public companies, including requiring certain corporate governance practices. Our management and other personnel devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations increase our legal and financial compliance costs and will make some activities more time-consuming and costly.

In addition, the Sarbanes-Oxley Act requires, among other things, that we maintain effective internal controls for financial reporting and disclosure controls and procedures. In particular, we have been required to perform system and process evaluation and testing on the effectiveness of our internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act. Then, beginning in fiscal 2010, our independent registered public accounting firm has reported on the effectiveness of our internal controls over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act. In the future, our testing, or the subsequent testing by our independent registered public accounting firm, may reveal deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses. Our compliance with Section 404 requires that we incur substantial accounting expense and expend significant management efforts. Moreover, if we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our independent registered public accounting firm identifies deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline, and we could be subject to sanctions or investigations by the SEC or other regulatory authorities, which would require additional financial and management resources.

http://www.sec.gov/Archives/edgar/data/935419/0001144204150707...

9

Uninsured Risks

We maintain insurance in amounts we consider adequate for personal injury and property damage to which the business of the Company may be subject. However, there can be no assurance that uninsured liabilities in excess of the coverage provided by insurance, which liabilities may be imposed pursuant to the Texas "Dram Shop" statute or similar "Dram Shop" statutes or common law theories of liability in other states where we operate or expand. For example, the Texas "Dram Shop" statute provides a person injured by an intoxicated person the right to recover damages from an establishment that wrongfully served alcoholic beverages to such person if it was apparent to the server that the individual being sold, served or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others. An employer is not liable for the actions of its employee who over-serves if (i) the employer requires its employees to attend a seller training program approved by the TABC; (ii) the employee has actually attended such a training program; and (iii) the employer has not directly or indirectly encouraged the employee to violate the law. It is our policy to require that all servers of alcohol working at our clubs in Texas be certified as servers under a training program approved by the TABC, which certification gives statutory immunity to the sellers of alcohol from damage caused to third parties by those who have consumed alcoholic beverages at such establishment pursuant to the Texas Alcoholic Beverage Code. There can be no assurance, however, that uninsured liabilities may not arise in the markets in which we operate which could have a material adverse effect on the Company.

Our Previous Liability Insurer May Be Unable to Provide Coverage to Us and Our Subsidiaries

As previously reported, the Company and its subsidiaries were insured under a liability policy issued by Indemnity Insurance Corporation, RRG ("IIC") through October 25, 2013. The Company and its subsidiaries changed insurance companies on that date.

On November 7, 2013, the Court of Chancery of the State of Delaware entered a Rehabilitation and Injunction Order ("Rehabilitation Order"), which declared IIC impaired, insolvent and in an unsafe condition and placed IIC under the supervision of the Insurance Commissioner of the State of Delaware ("Commissioner") in her capacity as receiver ("Receiver"). The Rehabilitation Order empowered the Commissioner to rehabilitate IIC through a variety of means, including gathering assets and marshaling those assets as necessary. Further, the order stayed or abated pending lawsuits involving IIC as the insurer until May 6, 2014. Since the expiration of the order the lawsuits have resumed. We are funding 100% of the costs of litigation and will seek reimbursement from the bankruptcy receiver.

On April 10, 2014, the Court of Chancery of the State of Delaware entered a Liquidation and Injunction Order With Bar Date ("Liquidation Order"), which ordered the liquidation of IIC and terminated all insurance policies or contracts of insurance issued by IIC. The Liquidation Order further ordered that all claims against IIC must be filed with the Receiver before the close of business on January 16, 2015 and that all pending lawsuits involving IIC as the insurer are further stayed or abated until October 7, 2014. As a result, the Company and its subsidiaries no longer have insurance coverage under the liability policy with IIC. Currently, there are multiple civil lawsuits pending or threatened against the Company and its subsidiaries; and other potential lawsuits for incidents that occurred before October 25, 2013 could still be filed. The Company has retained counsel to defend against and evaluate these claims and lawsuits. The Company filed the appropriate claims against IIC with the Receiver before the January 16, 2015 deadline; however, there are no assurances of any recovery from these claims. It is unknown at this time what effect this uncertainty will have on the Company. As previously stated, the Company has obtained general liability coverage from another insurer, effective October 25, 2013, which will cover any claims arising from actions after that date.

Limitations on Protection of Service Marks

Our rights to the tradenames "RCI Hospitality Holdings, Inc.", "Rick's", "Rick's Cabaret", "Tootsie's Cabaret", "Club Onyx," "XTC Cabaret," "Temptations," "Jaguars," "Downtown Cabaret," "Cabaret East," Cabaret North," Bombshells," "Vee Lounge" and "The Black Orchid" are established under common law, based upon our substantial and continuous use of these tradenames in interstate commerce, some of which have been in use at least as early as 1987. "RICK'S AND STARS DESIGN" logo, "RCI HOSPITALITY HOLDINGS, INC.", "RICKS," "RICK'S CABARET", "CLUB ONYX", "XTC CABARET," "SILVER CITY CABARET", "THE BLACK ORCHID", "BOMBSHELLS" and "EXOTIC DANCER" are registered through service mark registrations issued by the United States Patent and Trademark Office. As of this date we have pending registration applications for the names "THE SEVILLE" and "DOWN IN TEXAS SALOON". We also own the rights to numerous tradenames associated with our media division. There can be no assurance that these steps we have taken to protect our Service Marks will be adequate to deter misappropriation of our protected intellectual property rights. Litigation may be necessary in the future to protect our rights from infringement, which may be costly and time consuming. The loss of the intellectual property rights owned or claimed by us could have a material adverse affect on our business.

10

Anti-takeover Effects of Issuance of Preferred Stock

The Board of Directors has the authority to issue up to 1,000,000 shares of Preferred Stock in one or more series, to fix the number of shares constituting any such series, and to fix the rights and preferences of the shares constituting any series, without any further vote or action by the stockholders. The issuance of Preferred Stock by the Board of Directors could adversely affect the rights of the holders of common stock. For example, such issuance could result in a class of securities outstanding that would have preferences with respect to voting rights and dividends and in liquidation over the common stock, and could (upon conversion or otherwise) enjoy all of the rights appurtenant to common stock. The Board's authority to issue Preferred Stock could discourage potential takeover attempts and could delay or prevent a change in control of the Company through merger, tender offer, proxy contest or otherwise by making such attempts more difficult to achieve or more costly. There are no issued and outstanding shares of Preferred Stock; there are no agreements or understandings for the issuance of Preferred Stock, and the Board of Directors has no present intention to issue Preferred Stock.

We Have Not Paid Dividends on Common Shares in the Past

Since our inception we have not paid any dividends on our common stock.

Future Sales of Our Common Stock May Depress Our Stock Price

The market price of our common stock could decline as a result of sales of substantial amounts of our common stock in the public market, or as a result of the perception that these sales could occur. In addition, these factors could make it more difficult for us to raise funds through future offerings of common stock.

Our Stock Price Has Been Volatile and May Fluctuate in the Future

The trading price of our securities may fluctuate significantly. This price may be influenced by many factors, including:

- our performance and prospects;
- the depth and liquidity of the market for our securities;
- sales by selling shareholders of shares issued or issuable in connection with certain convertible notes;
- investor perception of us and the industry in which we operate;
- changes in earnings estimates or buy/sell recommendations by analysts;
- general financial and other market conditions; and
- domestic economic conditions.

Public stock markets have experienced, and may experience, extreme price and trading volume volatility. These broad market fluctuations may adversely affect the market price of our securities.

We are Dependent on Key Personnel

Our future success is dependent, in a large part, on retaining the services of Mr. Eric Langan, our President and Chief Executive Officer. Mr. Langan possesses a unique and comprehensive knowledge of our industry. While Mr. Langan has no present plans to leave or retire in the near future, his loss could have a negative effect on our operating, marketing and financial performance if we are unable to find an adequate replacement with similar knowledge and experience within our industry. We maintain key-man life insurance with respect to Mr. Langan. Although Mr. Langan is under an employment agreement (as described herein), there can be no assurance that Mr. Langan will continue to be employed by us. The loss of Mr. Langan could have a negative effect on our operating, marketing, and financing performance.

Cumulative Voting is Not Available to Stockholders

Cumulative voting in the election of Directors is expressly denied in our Articles of Incorporation. Accordingly, the holder or holders of a majority of the outstanding shares of our common stock may elect all of our Directors.

Our Directors and Officers Have Limited Liability and Have Rights to Indemnification

Our Articles of Incorporation and Bylaws provide, as permitted by governing Texas law, that our Directors and officers shall not be personally liable to us or any of our stockholders for monetary damages for breach of fiduciary duty as a Director or officer, with certain exceptions. The Articles further provide that we will indemnify our Directors and officers against expenses and liabilities they incur to defend, settle, or satisfy any civil litigation or criminal action brought against them on account of their being or having been its Directors or officers unless, in such action, they are adjudged to have acted with gross negligence or willful misconduct.

The inclusion of these provisions in the Articles may have the effect of reducing the likelihood of derivative litigation against Directors and officers, and may discourage or deter stockholders or management from bringing a lawsuit against Directors and officers for breach of their duty of care, even though such an action, if successful, might otherwise have benefited us and our stockholders.

The Articles provide for the indemnification of our officers and Directors, and the advancement to them of expenses in connection with any proceedings and claims, to the fullest extent permitted by Texas law. The Articles include related provisions meant to facilitate the indemnitee's receipt of such benefits. These provisions cover, among other things: (i) specification of the method of determining entitlement to indemnification and the selection of independent counsel that will in some cases make such determination, (ii) specification of certain time periods by which certain payments or

determinations must be made and actions must be taken, and (iii) the establishment of certain presumptions in favor of an indemnitee.

11

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers and controlling persons pursuant to the foregoing provisions, we have been advised that in the opinion of the Securities and Exchange Commission, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

A failure to maintain food safety throughout the supply chain and food-borne illness concerns may have an adverse effect on our business.

Food safety is a top priority, and we dedicate substantial resources to ensuring that our guests enjoy safe, quality food products. However, food safety issues could be caused at the point of source or by food suppliers or distributors and, as a result, be out of our control. In addition, regardless of the source or cause, any report of food-borne illnesses such as E. coli, hepatitis A, trichinosis or salmonella, and other food safety issues including food tampering or contamination, at one of our restaurants could adversely affect the reputation of our brands and have a negative impact on our sales. Even instances of food-borne illness, food tampering or food contamination occurring solely at restaurants of our competitors could result in negative publicity about the food service industry generally and adversely impact our sales. The occurrence of food-borne illnesses or food safety issues could also adversely affect the price and availability of affected ingredients, resulting in higher costs and lower margins.

We may experience higher-than-anticipated costs associated with the opening of new establishments which may adversely affect our results of operations.

Our sales and expenses can be impacted significantly by the number and timing of the opening of new nightclub and bar/restaurant establishments. We incur substantial pre-opening expenses each time we open a new establishment. The expenses of opening new locations may be higher than anticipated. An increase in such expenses could have an adverse effect on our results of operations.

Other Risk Factors May Adversely Affect Our Financial Performance

Other risk factors that could cause our actual results to differ materially from those indicated in the forward-looking statements by affecting, among many things, pricing, consumer spending and consumer confidence, include, without limitation, changes in economic conditions and financial and credit markets, credit availability, increased fuel costs and availability for our employees, customers and suppliers, health epidemics or pandemics or the prospects of these events (such as reports on avian flu), consumer perceptions of food safety, changes in consumer tastes and behaviors, governmental monetary policies, changes in demographic trends, terrorist acts, energy shortages and rolling blackouts, and weather (including, major hurricanes and regional snow storms) and other acts of God.

## Item 1B. Unresolved Staff Comments

None

## Item 2. Properties .

Our principal corporate office is located at 10959 Cutten Road, Houston, Texas 77066, and consists of a 9,000 square feet office/warehouse building. This corporate office is no longer adequate to meet our needs.  We have recently begun construction on a nearby tract of land where we are building a new corporate office facility.

Our nightclubs and their locations are summarized in the "Schedule of Clubs" in Item 1, which is incorporated herein by reference. Of these clubs, we own the real estate for 32 and lease the other 11. We also own four other properties, two of which are presently leased to third parties and two which we are seeking tenants. The leases for the properties we lease are typically for a fixed rental rate without revenue percentage rentals. The lease terms generally have initial terms of ten to twenty years with renewal terms of five to twenty years. At September 30, 2015, certain of our owned properties were collateral for mortgage debt amounting to approximately $57.6 million. Also see more information in the following Notes to Consolidated Financial Statements: D. - Property and Equipment, F. - Long-Term Debt and J. - Commitments and Contingencies.

## Item 3. Legal Proceedings.

See the "Legal Matters" section within Note J, Commitments and Contingencies, of Notes to Consolidated Financial Statements within this Annual Report on Form 10-K for the requirements of this Item, which section is incorporated herein by reference.

## Item 4. Mine Safety Disclosures

Not applicable.

---