USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
JAIME EDMONDSON *et al.*,                    :
                                             :
                              Plaintiffs,    :
                                             :            16-CV-2242 (VEC)
              -against-                      :
                                             :
                                             :            OPINION AND ORDER
RCI HOSPITALITY HOLDINGS, INC.,              :
PEREGRINE ENTERPRISES, INC., RCI             :
DINING SERVICES (37TH STREET), INC., and     :
ERIC LANGAN,                                 :
                                             :
                              Defendants.    :
--------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

       This action stems from the alleged misappropriation and unauthorized publication of over

180 images of fifty-two models to promote so-called "gentleman's clubs" throughout the United

States.  Plaintiffs claim their images were misappropriated, intentionally altered, and published

without their consent in order to make it appear that they worked at or endorsed one of

Defendants' clubs.  Plaintiffs argue that, because they place a high degree of value on their good

will, reputation, and individual brands, Defendants' unauthorized use of their images to promote

their clubs has resulted in substantial damages.  Now before the Court are (1) Plaintiffs' motion

to exclude the opinion and testimony of Defendants' damages expert Jeff Anderson and

(2) Defendants' motion to exclude the survey and report of Plaintiffs' expert Martin Buncher and

the opinion and testimony of Plaintiffs' damages expert Stephen Chamberlin.  Dkts. 111, 114.

For the following reasons, both motions are GRANTED.

# I.    BACKGROUND

Plaintiffs are fifty-two (52) professional models[1] whose photographs have appeared in magazines such as *Maxim*, *Seventeen*, *Vogue*, *Health & Wellness*, *GQ*, *Elle, In Style*, *Cosmopolitan*, *Playboy*, and *Marie Claire*, and have modeled for brands including Nike, Reebok, Guess Jeans, Diesel, Victoria's Secret, MAC Cosmetics, Target, Nordstrom, and Saks Fifth Avenue.  Second Amended Compl. ("SAC"), Dkt. 44 ¶¶ 75-224.  Many of the Plaintiffs have also appeared in movies, television shows, music videos, and commercials.  *Id.*  Plaintiffs allege that over 180 images were misappropriated, altered, and used without their consent to promote one or more of Defendants' forty-three (43) "gentleman's clubs" nationwide (the "Clubs").  *See id.*  Plaintiffs argue that their images were used to create the false impression that Plaintiffs were strippers who worked at or endorsed the Clubs.  *Id.* ¶ 77.  Plaintiffs' pictures appear in social media posts made by Defendants, along with captions such as: "Come enjoy the best of both worlds sports and sexy ladies!" and "Come relax and rejuvenate with the sexy Jaguar Girls and don't forget our $5 Cover, $5 table dances!!!"  *See, e.g.,* SAC Exs. D, AA.

Plaintiffs bring this action for false endorsement, invasion of privacy, misappropriation of likeness, and defamation.  *See* SAC ¶¶ 259-300.  Plaintiffs seek actual damages, punitive damages, and an order permanently enjoining Defendants from using Plaintiffs' images to promote the Clubs.  *Id.* ¶ 301.

## I.    Defendants' Expert Jeff Anderson

Plaintiffs seek to exclude the testimony of Defendants' damages expert Jeff Anderson.  *See* Pl. Mem. of Law, Dkt. 113.  Anderson's expert report details his opinion regarding the damages resulting from the misappropriation of Plaintiffs' images; he relies on two methods to

---

[1]    Plaintiff Brittany Wilcox is neither a model nor an actress; Wilcox appears in a picture with her sister Jessica Rockwell, who is a professional model.  SAC ¶¶ 161-62.

conclude that the total damages incurred for all Plaintiffs collectively range from $78,000 to $102,000. Anderson Report, Dkt. 117, Ex. A at 113-19 ("Anderson Report"). Anderson's first method purports to calculate the fair market value of the misappropriated images by analyzing the "arms-length cost to acquire rights to an equivalent number of comparable stock images." *Id.* at 112. Anderson claims that, because Getty Images offers a large selection of stock photos of different women that are allegedly "directly comparable to [the images] at issue in this [c]ase," the appropriate measure of damages is how much Defendants "would [have been] charged to license [those] comparable images." *Id.* at 113-14. The cost of a royalty-free license for a Getty stock photo is based on the resolution of the file; the price ranges from $50 to $499.[2] *Id.* at 114. Accordingly, Anderson calculates the damages incurred by each Plaintiff by multiplying the number of misappropriated images of each Plaintiff by $499, the cost of licensing a large stock photo.[3] *See id.* at 115. Anderson concludes that the sum of these individual amounts, approximately $78,000, represents what Defendants would have paid to "license the rights to an equivalent number of comparable images," and is therefore an accurate assessment of Plaintiffs' damages. *Id.* at 114.

To determine the purported "upper bound of the damages range," Anderson analyzed the previous contracts Plaintiffs Jessa Hinton and Jessica Burciaga had with Crazy Horse III, a comparable club in Las Vegas.[4] *Id.* at 112, 116. Burciaga was paid $3,500 for a three-hour appearance at Crazy Horse III in September 2014; her contract required her to participate in five

---

[2]     According to the Getty Image Price Chart for stock photos, an extra small image (502 KB) can be licensed for $50, a small image (1.0 MB) can be licensed for $175, a medium image (8.59 MB) can be licensed for $375, and a large image (60.2 MB) can be licensed for $499. Anderson Report at 114.

[3]     For example, Defendants allegedly misappropriated two images of Plaintiff Alana Campos. According to Anderson, because a royalty-free license of an allegedly comparable stock photo costs $499, Campos' damages amount to $998. *See* Anderson Report at 115.

[4]     Crazy Horse III is not a defendant in this case.

internet interviews and five radio/television interviews prior to the event, appear in red carpet photographs at the event, greet the crowd, host the Sports-Bar at the club for three hours, complete on-site interviews, provide three recent high-resolution photographs, and promote the event on social media. *Id.* at 116-17. Hinton was paid $750 to make a three-hour appearance at Crazy Horse III in May 2012.[5] *Id.* at 117. Anderson claims that the compensation paid to Burciaga and Hinton pursuant to these two contracts is a "representative indication of the average compensation which would be earned by all of the [Plaintiffs]." *Id.* at 118. Accordingly, by averaging $3,500 and $750, Anderson concludes that the damages for each individual Plaintiff are $2,125, amounting to a total of $102,000. *Id.* at 118-119. Anderson notes, however, that because the models' contracts with Crazy Horse III compensated Buricaga and Hinton for "significant obligations" that were "beyond the scope of the Defendants' alleged usage" of Plaintiffs' images in this case, the resulting average compensation represents the "upper bound of the damages range" appropriate in this case. *Id.* at 118-19.

Based on these two methods of calculating damages, Anderson concludes that the fair market value of Plaintiffs' images ranges from $78,343 to $102,000.

## II.  Plaintiffs' Expert Martin Buncher

Defendants seek to exclude the Survey and Report of Plaintiffs' expert Martin Buncher. Dkt. 114. The Buncher Survey is a self-administered internet questionnaire that sought to measure the degree of confusion caused by the use of Plaintiffs' images in Defendants' advertisements. *See* Buncher Report, Dkt. 115, Ex. A ("Buncher Report"). Potential survey respondents were invited to participate through the internet; the questionnaires were ultimately

---

[5]     Hinton's full contract with Crazy Horse III was not produced.

completed by 3,620 people from the metropolitan areas surrounding the club locations.[6]  *Id.* at 8.

Participants included men and women, ages twenty-one years and older, who had patronized a

"gentleman's club" in the past two years.  *Id.*  Each survey contained four of the images that

appeared in the Club's advertisements in the respective geographical area.[7]  *Id.* at 7; Dkt. 115,

Ex. A-2.  The survey asked respondents to indicate, *inter alia*,  (1) what they believed the ads

were trying to communicate to them; (2) whether they believed the women shown had any

affiliation with the club being advertised; (3) whether they believed the women agreed to

sponsor, endorse, or promote the club being advertised; (4) whether they believed the women

"enjoy a lifestyle" like that reflected in the advertisement; (5) whether they believed the women

in the photos "participate in the events or activities" that take place in the club being advertised;

(6) whether they believed the women were paid to appear in the ads; and (7) whether they

recognized the women in the ads.  *See* Dkt. 115, Ex. A-2.

　　　The survey responses indicated that 68% of the respondents believed Plaintiffs had some

affiliation with the Clubs, 73% believed the women in the ads enjoyed a lifestyle like that

reflected in the advertisements, 67% believed Plaintiffs participated in the events that take place

in the Clubs, and 83% believed Plaintiffs approved the use of her image(s).  Buncher Report at

19-20.  After analyzing the responses, Buncher concluded that the respondents believed

Defendants were "using these women to make them think they are the kind of women they

would expect to see in the Club," and that the use of their images "contribute[d] in a major way

to [causing respondents to] consider patronizing [the Club]."  *Id.* at 24.

---

[6]　　　The surveys were administered in New York City, Miami, Minneapolis, New Orleans, Phoenix, Edinburg & Harlingen, Dallas, El Paso, San Antonio, Houston, and Austin.  Buncher Report at 8.

[7]　　　The Buncher report indicates that the "images were selected initially at random from all those reviewed, but then given more consideration to those that showed the Plaintiff(s) in the execution along with other content material referencing the Club advertised."  Buncher Report at 7.

### III.    Plaintiff's Expert Stephen Chamberlin

Defendants also seek to exclude the opinion and testimony of Plaintiffs' damages expert Stephen Chamberlin.  Dkt. 114.  Chamberlin's report includes a summary of each Plaintiff's background, an analysis of some of her prior modeling contracts, and an estimate of the damages incurred by Defendants' misappropriation of her image(s).  *See, e.g.,* Chamberlin Report, Dkt. 115, Ex. 7  ("Chamberlin Report") at 19-26.  Chamberlin determines the purported damages for each Plaintiff by first calculating the Plaintiff's "working day rate," which he bases on the model's desirability, her prior work history, and the nature of the business seeking the model's service.  Chamberlin Report at 10.  Chamberlin then multiplies the Plaintiff's working day rate by the number of distinct "usages" of each image; Chamberlin defines a "usage" as "the way and method of use and distribution of [the] image[]."  *Id.* at 8.  According to Chamberlin, distinct usages include advertising, social media, third party promotion, branding, billboard displays, and coupons.[8]  *Id.*  After calculating the damages for each Plaintiff, Chamberlin concludes that the "fair market value of all presently known image infringements [] totals at a minimum, $8,710,000."  *Id.* at 6.

## DISCUSSION

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[8]    To use Alana Campos as an example of Chamberlin's analysis; Defendants allegedly misappropriated two images of Campos.  *See* SAC, Ex. II.  Chamberlin states that, "based on [his] experience and expertise," Campos's working day rate is $15,000.  Chamberlin Report at 26.  Next, Chamberlin claims that there were three unauthorized "usages" of the first image of Campos (advertising, social media, and branding), and two unauthorized "usages" of the second image (advertising and social media).  Chamberlin Report at 26; SAC, Ex. II.  Accordingly, Chamberlin concludes that the fair market value of the two images used by the Clubs is $15,000 x 5 = $75,000.  *Id.*

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

While the proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact, the district court acts as the "ultimate gatekeeper" against unreliable expert testimony.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted); *see, e.g., Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005); *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 426 (S.D.N.Y. 2015), *aff'd sub nom. Estate of Jaquez by Pub. Adm'r of Bronx Cty. v. City of New York*, 706 F. App'x 709 (2d Cir. 2017).   This gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The threshold question for the Court is whether the "proffered expert testimony is relevant."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  If the proposed testimony is relevant, the Court must then determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered."  *Id.* (internal citation and quotation marks omitted).  The Supreme Court has laid down several factors to consider in making this inquiry, including "whether a theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; whether uniform "standards controlling the technique's operation" exist; and whether the theory or technique enjoys "general acceptance" within the relevant scientific or professional community.

*Daubert*, 509 U.S. at 593-94 (internal quotation marks omitted). The Court's ultimate objective is to "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

## I. Defendants' Expert Jeff Anderson

Plaintiffs seek to exclude the opinion and testimony of Defendants' damages expert Jeff Anderson. Plaintiffs argue that he is not qualified to serve as an expert; his opinion is unreliable; and his opinion would not be helpful to the jury. Pls'. Mem. of Law, Dkt. 113. Because Anderson's methodology is neither reliable nor helpful, Plaintiffs' motion is granted.

### a. Anderson Is Qualified to Offer an Expert Opinion

Plaintiffs argue that Anderson is not qualified to offer an expert opinion because he has no specific experience in the modeling industry. Pls'. Mem. of Law at 5-7. The Court disagrees.

The Court may admit expert testimony if the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The qualification requirement is to be "liberally construed," *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04-CV-7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (citing *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985), and an "expert should not be required to satisfy an overly narrow test of his own qualifications." *Valentin v. New York City,* No. 94-CV-3911, 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997) (quoting *Lappe v. American Honda Motor Co.*, 857 F. Supp. 222, 226 (N.D.N.Y. 1994), *aff'd*, 101 F.3d 682 (2d Cir. 1996)). Moreover, if an expert has educational and experiential qualifications in a field "closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab.*

*Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)).

Here, Anderson is qualified to serve as an expert. Anderson is the Managing Director of an intellectual asset consulting firm specializing in trademark, copyright, and rights of publicity valuation and licensing, a Certified Licensing Professional, and a Certified Valuation Analyst. Anderson Report at 6, 121. He has written and lectured on fair market valuation and served as an expert in thirty-one fair market valuation cases. *Id.* at 122-25. Although Plaintiffs argue that Anderson is unqualified to offer an opinion on Plaintiffs' damages because he has never been employed as a modeling agent, such quibbles regarding a witness's qualifications or lack of specialization go to the weight of the expert's testimony, rather than to its admissibility. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995); *Stagl*, 117 F.3d at 81-82; *Fernandez v. Chios Shipping Co.,* 542 F.2d 145, 153-54 (2d Cir. 1976); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 282.

>    **b.**    **Anderson's Methods Are Not Reliable**

To determine whether a proposed expert opinion is reliable, courts must consider several factors, including "whether a theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; whether uniform "standards controlling the technique's operation" exist; and whether the theory enjoys "general acceptance" within an identifiable relevant scientific or professional community. *Daubert*, 509 U.S. at 593–94 (1993) (internal quotation marks omitted). Courts must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. District courts must exclude expert testimony that is "speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest

bad faith.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 214

(2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

A plaintiff in a right of publicity case is entitled to damages equaling "the fair market

value of the use for the purposes of trade of [her] face, name, and reputation." *Grant v. Esquire,

Inc.*, 367 F. Supp. 876, 881 (S.D.N.Y. 1973). As noted, *supra*, Anderson claims that the fair

market value of the misappropriated images is the "arms-length price charged to license

comparable stock photos." Anderson Report at 7. Because stock photos can be licensed from

Getty for between $50 and $499, depending on file size, Anderson concludes that the appropriate

damages for the fifty-two Plaintiffs amounts to $78,343. *Id.* Plaintiffs argue that, because their

images are not licensed stock photos, the cost to license a stock photo of a different model from

Getty is not comparable to what it might cost to license the image of one of the Plaintiffs. Pls'.

Mem. of Law at 9-12. The Court agrees.

The Court finds several flaws in Anderson's methodology that render his opinion

unreliable and unhelpful to the jury. First, although Anderson is correct that certain stock photos

of women in lingerie or bathing suits may be licensed from Getty for anywhere between $50 and

$499, Anderson does not explain how stock photos of different women are, in any way,

comparable to the misappropriated images of Plaintiffs in this case nor does he provide any basis

for believing that the fees paid for those stock photos are equivalent to what it might have cost to

license Plaintiffs' images for these uses. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Because Plaintiffs' images are not available on Getty for royalty-free licenses, they are not

comparable to the stock photos referenced by Anderson.[9]  In short, Anderson's opinion is based on a comparison of matters that are not reasonably comparable, and therefore must be excluded. *Joiner,* 522 U.S. at 146 (holding that a court may exclude an expert opinion if it "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered"); *Olive v. Gen. Nutrition Ctrs., Inc.*, 30 Cal. App. 5th 804, 819 (Ct. App. 2018) (excluding similar proposed expert testimony by Weston Anson, Anderson's business partner, on the grounds that "an expert may not offer an opinion based on a comparison of matters that are not reasonably comparable.").

Although the price range for licensing Getty stock photos may have been a helpful starting point for assessing damages in this case, Anderson's failure to account for the impact that the identity of the model has on the fair market value of her image renders his opinion unreliable and nonsensical.  *See Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016) (allowing an expert opinion regarding the fair market value of misappropriated images that relied on quotes from Getty regarding licensing fees for similar images *and* made an adjustment to reflect the uniqueness of the images and the impact of defendant's usage).  Here, Anderson fails to make any adjustment to account for "the scarcity and exclusivity of the [Plaintiffs'] images as compared to the images for which he had secured rates for comparative purposes."  *Id* at 393. This failure to account for the unique identity of each woman depicted in the photograph results in the illogical conclusion that the fair market value of an image of Carmen Electra, a well-known model and actress, would somehow be equal to the fair market value of an image of Brittany Wilcox, who is neither a professional model nor an actress.  Accordingly, Anderson's

---

[9]     While *different* images of certain of the Plaintiffs are available for licensing from Getty, they are only available for editorial use, which excludes advertisements.  The Getty website indicates that images licensed for editorial use may only be used for "Newspapers and magazines (except for covers), editorial broadcasts, documentaries, non-commercial websites, blogs and social media posts *illustrating matters of public interest.*" (emphasis added).

methodology is not reasonably applied "to the facts of [this] case," and, for this reason as well, his resulting opinion regarding the damages incurred by Plaintiffs must be excluded. *United States v. Pryor*, 474 F. App'x 831, 834 (2d Cir. 2012); *Amorgianos,* 303 F.3d at 266 (explaining that an opinion must be excluded if it "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached"); *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012) (excluding expert testimony when an expert "fail[s] to take into account a plethora of specific facts" relevant to that case).

Anderson's second method for assessing damages is equally flawed. Defendants' assertion that Anderson analyzed "all available, actual historic earnings records and prior contracts for each of the 52 Plaintiffs," to determine the total fair market value of Plaintiffs' images is misleading. Defs.' Mem. of Law, Dkt. 120 at 4. Although much of Anderson's report is devoted to analyzing each Plaintiff's prior work history, that analysis is used to refute the opinion proffered by Plaintiffs' damages expert. Anderson's own opinion regarding Plaintiffs' damages relies on only *two* prior contracts; as noted *supra*, Anderson uses Hinton and Burciaga's contracts with Crazy Horse III to determine the "upper bound of the damages range." Anderson Report at 7. Anderson's report, however, offers no explanation as to why the compensation received by Hinton and Burciaga from Crazy Horse III is a representative indication of the average compensation that would be earned by each of the Plaintiffs in this case. Specifically, Anderson fails to account for the fact that: these two contracts involved only two out of the fifty-two Plaintiffs in this case, each of whom has varying degrees of experience and fame; the contracts he examined did not involve any of the Defendants in this case; and the contracts were executed at least two years before this lawsuit was filed. Moreover, even if formulating an opinion based on a mere two data points were appropriate, Anderson does not explain why averaging the two amounts is the most appropriate or accurate way to determine damages in this

case, rather than conducting a more nuanced analysis of the distinct obligations pursuant to each contract.  Although Anderson acknowledges that Buricaga's contract required interviews, hosting, photographs, and online promotion, he makes no attempt to determine what portion of her $3,500 contract compensated each obligation.  As a result, the Court has no way to determine whether the amounts paid to compensate Hinton and Buricaga for the various obligations in their contracts is an accurate estimate of the fair market value of a single image.  In other words, there is simply "too great an analytical gap between the data and the opinion proffered," connected only by the "*ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.

      **c.**       **Even if it Were Based on Adequate Data, Anderson's Second Method Does Not Warrant Expert Testimony**

Finally, Anderson's second method of assessing damages is not based on any "scientific, technical, or specialized knowledge."  Fed. R. Evid. 702(a); *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("the district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.") (internal quotation marks omitted).  Anderson arrives at the purported "upper bound of damages" for each Plaintiff by calculating the average of the two amounts paid to Hinton and Burciaga, a basic mathematical calculation taught in grade school.  *See United States v. Sepulveda-Hernandez*, 752 F.3d 22, 34 (1st Cir. 2014) ("Simple arithmetic, such as ordinary multiplication, is a paradigmatic example of the type of everyday activity that goes on in the normal course of human existence.").  Because Anderson's opinion is one that the jury could reach with their own "common knowledge and common sense," no expert testimony is warranted.  4 Weinstein's Federal Evidence § 702.03 (2019) (expert testimony is generally unhelpful and not permitted when it concerns "factual issues that are within the knowledge and experience of ordinary lay

people, because it would not help the trier of fact to understand the evidence or determine a fact in issue.").

In sum, Anderson's opinions are unreliable, fail to consider the specific facts of this case, and would offer nothing more than what Defendants' attorneys can argue in closing arguments or what the jury is already "capable of understanding and deciding without the expert's help." *Mulder*, 273 F.3d at 101 (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)). Accordingly, Plaintiffs' motion to exclude Anderson's opinion and testimony is granted.

## II.     Plaintiffs' Expert Martin Buncher

Defendants seek to exclude the Buncher Report and Survey on the grounds that the Survey is replete with methodological flaws.[10]  *See* Defs.' Mem. of Law, Dkt. 118 at 2.  The Court agrees.

The Court's gate-keeping responsibility regarding expert testimony extends to expert opinions based on the results of surveys.  *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 561-65 (S.D.N.Y. 2007).  To be admissible, a survey must be "properly designed, executed, and described," and must be "conducted in accordance with generally accepted survey principles."  *See* Shari Seidman Diamond, *Reference Guide on Survey Research, in* Reference Manual on Scientific Evidence, 359, 362-64 (Federal Judicial Center, 3d ed. 2011). In assessing the reliability of a survey, courts consider factors including: (1) whether a representative sample of a properly-defined universe was selected; (2) whether the questions were clear and precise or ambiguous and leading; (3) whether the data gathered was accurately reported and analyzed; and (4) whether the objectivity of the entire process was ensured.

---

[10]      Defendants do not dispute Buncher's qualifications; Buncher holds a master's degree in industrial psychology and has 53 years of experience in the fields of strategic planning, marketing research, and marketing consulting.  He is the CEO of Intercontinental Marketing Investigations Inc. and has personally conducted over 500 secondary research projects, 6,000 focus groups, and 1,800 quantitative investigations.  *See* Buncher Report at 26-27.

*Schering Corp. v. Pfizer Inc*., 189 F.3d 218, 225 (2d Cir. 1999). Moreover, Federal Rules of

Evidence 702 and 403 "require the court to look at the cumulative effect of all of the flaws in a

survey" in determining its admissibility. *Malletier*, 525 F. Supp. 2d at 596 (citing *Mastercard

Int'l Inc. v. First Nat'l Bank of Omaha Inc*., No. 02-CV-3691, 2004 WL 326708, at *10

(S.D.N.Y. Feb. 23, 2004) (excluding a survey based on the cumulative effect of flaws in the

methodology that "diminish[ed] its relevance in predicting actual confusion … such that

potential for the survey's results to prejudice unfairly, to confuse, and to mislead the jury

substantially outweighs any limited relevance.")).

 Several flaws in the Buncher Survey render it unreliable and unduly prejudicial. At the

outset, the Court notes that the survey included images of only four Plaintiffs in each

geographical area. The Buncher Report provides no explanation for how those four models and

images were selected or how they are representative of the other Plaintiffs and images that could

have been chosen; Buncher's explanation that "the images were selected initially at random from

all those reviewed, but then given more consideration to those that showed the Plaintiff(s) in the

execution along with other content material referencing the Club advertised" is

incomprehensible. Buncher Report at 7.

 Buncher's failure to use a control group also makes it difficult to measure the effect of

the specific images on the respondents or to account for participants' prior beliefs, biases,

guessing, and other external factors. *See Reference Guide on Survey Research* at 399; *Medisim

Ltd. v. BestMed LLC,* 861 F. Supp. 2d 158, 178 n.149 (S.D.N.Y. 2012) (explaining that the use of

a control group is the "gold standard" for eliminating survey responses due to a respondent's pre-

existing beliefs and other background noise). Although Plaintiffs argue that the survey is not a

"causal study" and therefore did not require a control group, Pl. Mem. of Law, Dkt. 123 at 5-6,

the Court disagrees. The Buncher Survey aimed to analyze whether Defendants' advertisements

*caused* consumer confusion, and is, therefore, a causal study warranting a control group. *See Reference Guide on Survey Research* at 397 ("Many surveys are designed not simply to describe attitudes or beliefs …, but to determine the source of those attitudes or beliefs or behaviors. That is, the purpose of the survey is to test a causal proposition [such as] how [] a trademark or the content of a commercial affect[s] respondents' perceptions or understanding of a product or commercial.").

Moreover, Buncher's attempt to include a "control question" was inadequate and ineffective. In the "control question," the Survey presented respondents with two images side-by-side; the first was the Defendants' advertisement and the second was the identical image with the Plaintiff removed from the frame.[11] The question read: "here again is one of the ads you have just seen, along with the same ad, but without the woman in it," and asked respondents, "as you look at these two ads, which one do you feel would be more likely to interest you in considering the possibility of visiting the club?" Dkt. 115, Ex. A-2 at 11. By expressly stating that the second image is identical absent the presence of the Plaintiff, the survey alerted respondents that the identity of the Plaintiff was the variable being measured and defeated the purpose of a control question. Moreover, because the second image, without the Plaintiff, was essentially an empty background, it defies logic that it would pique the interest of any respondent. *See Reference Guide on Survey Research* at 399-400 ("the choice of an appropriate control group requires some care and should influence the weight that the survey receives … a control stimulus should not be less attractive than the experimental stimulus is to respondents,

---

[11] The Survey is not paginated and the questions are not numbered. This "control question" is the twenty-second question that appears in the survey. *See* Dkt. 115, Ex. A-2 at 11.

because attractiveness may affect perceived familiarity.").[12]  In sum, the Survey's failure to include an adequate control group or control question undermines the reliability of the results.

The Buncher Survey's questions themselves were also flawed.  The survey did not instruct respondents not to guess and failed to include an option to indicate a lack of knowledge or understanding, both of which are "fatal defects where the questions themselves are confusing and misleading."  *Toth v. 59 Murray Enterprises, Inc.*, No. 15-CV-8028, 2019 WL 95564 at *8 (S.D.N.Y. Jan. 3, 2019) (excluding a near-identical survey administered by Buncher due to flaws such as the failure to provide an opportunity to indicate lack of knowledge or an instruction not to guess); *Malletier*, 525 F. Supp. 2d at 596 ("consumer confusion surveys should be designed to discourage guessing").  For example, although the survey asked whether the respondents recognized the woman depicted in each of the four images presented, the question provided no opportunity for respondents either to express uncertainty or to provide the identity of the Plaintiff.[13]  As a result, the Court has no way to verify whether respondents truly recognized any of the Plaintiffs.  Significantly, only one respondent, out of 3,620, identified a specific Plaintiff in a question with an open-ended response; unsurprisingly the respondent named Carmen Electra.  Dkt. 115, Ex. A-6.  Thus, although respondents may have indicated that they recognized a particular Plaintiff, the significant methodological flaws in the survey questions render the responses unreliable and liable to mislead a jury.

Finally, the Survey questions included undefined and ambiguous terms.  For example, one question asked whether respondents believe that the women depicted enjoy a "lifestyle" like

---

[12]     Buncher, in fact, concedes that he did not even attempt to create a control image that was, in all other respects, equivalent to the image of a Plaintiff; the question instructed respondents to "assume the final quality of the new photo-shopped version would be comparable to that of the original."  Dkt. 115, Ex. A-2 at 11.

[13]      The Court also notes that the order of the questions undermined the meaningfulness of the responses.  For example, asking a respondent whether he recognized a woman in an image after he had viewed the exact same image ten times in a row yields a meaningless response.

that reflected in the ads, while another asked whether respondents believe the women in the pictures participate in "events which take place in the club and as reflected in the ads." Dkt. 115, Ex. A-2 at 10. The use of undefined terms such as "lifestyle" and "events" without providing any further description or definition renders these questions ambiguous and further undermines the reliability of the responses. *See Toth*, 2019 WL 95564 at *9.

Because the Buncher Survey is methodologically flawed, unreliable, and unduly prejudicial, Defendants' motion to exclude the Buncher Survey and Report is granted. *J&J Snack Foods Corp. v. Earthgrains Co*., 220 F. Supp. 2d 358, 369 (D.N.J. 2002) ("Significant methodological deficiencies lessen the survey's probative value so that its probative value is substantially outweighed by the prejudice [] and confusion that it would cause at trial"); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001).

## III.    Plaintiffs' Expert Stephen Chamberlin

Defendants also seek to exclude the opinion and testimony of Plaintiffs' damages expert Stephen Chamberlin. *See* Dkt. 114. Defendants argue that Chamberlin's report misrepresents Plaintiffs' prior earnings and calculates damages using a methodology that is inconsistent with Plaintiffs' prior contracts, industry practice, and common sense. Defs.' Mem. of Law, Dkt. 118 at 14. The Court agrees.

As noted *supra*, Chamberlin calculates Plaintiffs' purported damages by multiplying each model's "working day rate" by the alleged number of usages of her image. Chamberlin, however, does not explain how he initially calculated each Plaintiff's working day rate. Specifically, Chamberlin does not explain his decision to rely on certain of Plaintiffs' prior contracts in calculating the rate while disregarding others. For example, Chamberlin states that Alana Campos's working day rate, "based on [his] experience and expertise in this industry," is $15,000. Chamberlin Report at 26. Chamberlin, however, does not explain which, if any, of

Campos's nineteen prior contracts, in which her compensation ranged from $200 to $25,000, he used to derive her working day rate. *Id.*; *see* Anderson Report at 157. As a result, the Court cannot "undertake a rigorous examination of the facts on which [Chamberlin] relies, the method by which [he] draws an opinion from those facts, and how [he] applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267; *Great White Bear, LLC v. Mervyns, LLC*, 06-CV-13358, 2008 WL 2220662 at *3 (S.D.N.Y. May 27, 2008) (an expert report "must supply actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure.").[14] Instead, because Chamberlin only discusses Campos's $25,000 Playboy contract, the Court is left to assume that Chamberlin, when calculating each Plaintiff's working day rate, weighted heavily each Plaintiff's most lucrative contract, resulting in unreasonably inflated damages. For example, although Campos was paid $1,200 for an eight-hour photoshoot with Vixen Clothing, *see* Anderson Report at 157, Chamberlin makes no mention of that contract nor does he explain why his estimated fair market value of the misappropriated image in this case is fifteen times what Campos was paid for another photoshoot.[15] *See Toth*, 2019 WL 95564 at *13 ("The unreliability of Chamberlin's methodology is laid bare when comparing the damages in the Chamberlin Report with what plaintiffs were actually paid for their images or photoshoots.").

---

[14]    Chamberlin's analysis of Brittany Wilcox's damages further exposes the flaws in his methodology. Chamberlin calculates a working day rate of $5,000 for Wilcox based on the fact that she is "an extremely attractive woman that could have pursued a career as a model but chose homemaker instead." Chamberlin Report at 98. Chamberlin's opinion that Wilcox is entitled to $5,000 merely because he believes she *could* have pursued a career as a model is unsupported and speculative.

[15]    The Court also notes that Campos's second most remunerative contract, a contract with My Body Journey, paid Campos just $2,031 per month for three months; Campos was required to post at least eight images and two videos to Instagram each month. Anderson Report at 157. Chamberlin's estimated working day rate of $15,000 is more than twice what Campos was paid for three months of services, albeit services that would take a minimal amount of time to accomplish. Without suggesting an average is a particularly meaningful statistic, Campos's average compensation for her twenty prior contracts is approximately $2,391.

In addition to basing his opinion primarily on Plaintiffs' highest-paying contracts, Chamberlin does not account for the significant additional obligations that were part of some of those contracts. For example, Campos's $25,000 Playboy contract required: "still photography sessions … film sessions including behind the scenes video and audio recordings, … [potential] additional still photography or film sessions, … up to 20 days of promotional appearances, [and] a one-hour online chat on Playboy's website and an interview/appearance on Playboy's Sirius radio programming." Chamberlin Report at 21. Because the contract compensated Campos for far more than a single photoshoot, basing her working day rate on that contract yields a disproportionately high rate.[16] *See Toth*, 2019 WL 95564 at \*12 (excluding a report prepared by Stephen Chamberlin using the identical methodology used in this case because his methodology failed to account for the extensive additional obligations incorporated into each plaintiff's contract and the resulting "appropriate conclusion[s]" that the plaintiff's day rates would be "substantially less" than his estimates).

The second step of Chamberlin's methodology yields similarly overstated and unrealistic conclusions. Chamberlin claims that each Plaintiff's working day rate must be multiplied by the number of usages of her image; Chamberlin "improperly assumes that separate licenses would have been agreed upon for each use of an image, rather than the issuance of a single license for all uses of each image." *Toth*, 2019 WL 95564 at \*12. For example, because Defendants allegedly used Campos's image for branding, advertising, and social media, Chamberlin states that she is entitled to her alleged working day rate, $15,000, for three usages, totaling damages of

---

[16] Chamberlin's report states that her working day rate takes into account "the number of promotional days Ms. Campos worked (10 at a value of $450 per day) and the additional usages" that were included in the $25,000 fee. Chamberlin Report at 26. Chamberlin fails to acknowledge that the contract also included film sessions, audio recordings, online chats, interviews, and appearances. Chamberlin also does not explain how he calculates the value of each promotional day or why that amount is not a better measure of her working day rate.

$45,000. Chamberlin Report at 26. The terms of Plaintiffs' own contracts, however, indicate that they are not compensated for each use of an image. For example, Campos's three contracts with Vixen Clothing granted the company all rights to the images created during her photoshoot, and the ability to use the images in any way it desired, as well as the rights for "all existing medium and any and all media yet to be created." Anderson Report at 16, 157. Plaintiff Anya Monzikova's contracts are similar; her contract with Beautyge Brands USA granted the company the rights to use her images in-store, online, on packaging, and on sale materials for a five-year term, her contract with Toyota allowed the company to use her image "in any materials and any manner resulting from or related to the project," and her contract with Greater Palm Springs CVB granted the company rights to use her images "for unlimited use, unlimited time." Anderson Report at 162. Plaintiffs' prior deposition testimony in similar cases confirms that compensating models "per image per usage" is contrary to industry practice, further undermining the Report's reliability.[17] *See Daubert,* 509 U.S. at 593-94 (an expert's technique may be considered unreliable if it does not enjoy "general acceptance" within the relevant professional community).

In addition to being inconsistent with the express terms of Plaintiffs' contracts and contrary to industry practice, Chamberlin's methodology yields outrageously exaggerated damages estimates that are unsupported by Plaintiffs' prior earnings. *See Zerega Ave. Realty Corp.*, 571 F.3d at 214 (district courts must "exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad

---

[17] When asked if she has ever been paid "per image per usage," Plaintiff Cora Skinner testified, "[t]hat's not how the industry works." Anderson Report at 12. Plaintiffs Cielo Gibson, Jamillette Gaxiola, Jessica Burciaga, and Jessa Hinton gave similar responses in their depositions; when asked whether "in your entire career, have you ever been paid per image per use," each answered "no." *Id.* at 60, 70, 73, 75. Another Plaintiff, Eva Pepaj, clarified that she was not paid "per image per use," but rather "per photo shoot," *id.* at 63; Plaintiff Sheena Webber also testified that the modeling industry pays for the photo shoot, not per use of the resulting images, *id.* at 107.

faith.") (internal citation and quotation marks omitted).  For example, Chamberlin claims that

Plaintiff Monzikova's working day rate is $20,000.[18]  Chamberlin Report at 51.  Because

Chamberlin claims that Defendants used Monzikova's image for three "usages," Chamberlin

estimates that the fair market value of her image is $60,000, more than three times her most

remunerative contract to-date.  *See id.;* Anderson Report at 162.  Moreover, according to

Monzikova's 2015 tax returns, such an amount is almost equivalent to her annual income.  *See*

Anderson Report at 30.  Because Plaintiffs' prior work history indicates that Plaintiffs have

never earned fees of the magnitude described in the Chamberlin Report, Chamberlin's Report is

unrealistic and unreliable.  *See Zerega Ave*, 571 F.3d at 214; *Toth*, 2019 WL 95564 at *13

(excluding Chamberlin's report because his "fair market value" estimates were "nearly twice the

sum" of certain Plaintiffs' annual income).[19]

In sum, because the Court finds that Chamberlin does not use a reliable methodology to

calculate each Plaintiff's working day rate and his assumption that Plaintiffs' should be

compensated for each separate "usage" of her image is unfounded, Chamberlin's report must be

excluded.  *Amorgianos*, 303 F.3d at 267 (explaining that while the *Daubert* factors do not

constitute a rigid checklist, the expert's analysis must nonetheless be "reliable at every step.")

---

[18]     This estimated working day rate is highly inflated for the reasons discussed *supra*.  Specifically, the Court notes that Monzikova's thirteen other contracts involved compensation between $188 and $26,313.  Anderson Report at 162.  Chamberlin does not explain how or whether he has accounted for this range of compensation in calculating her working day rate.

[19]     The Court notes that even the estimated damages for Carmen Electra, arguably the most well-known Plaintiff in this case, are vastly inflated.  Chamberlin estimates that the fair market value of Electra's seven misappropriated images is $1,500,000.  (Chamberlin calculates a $100,000 working day rate and claims there were fifteen usages of her images.)  Chamberlin Report at 144-47.  A review of Electra's prior contracts shows that Electra's purported damages are 60x greater than the compensation she received for performing topless in twenty cabaret shows at a similar club over the course of fourteen days.  Anderson Report at 51-53.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion to preclude Defendants' expert Jeff Anderson from offering his report or testifying is GRANTED.  Defendants' motion to preclude Plaintiffs' experts Martin Buncher and Stephen Chamberlin from offering their reports or testifying is also GRANTED.  The Clerk of Court is respectfully directed to terminate the open motions at docket entries 111 and 114.

The parties must meet and confer and, not later than **April 15, 2020**, propose a briefing schedule for any motion for summary judgment either side wishes to make.  If neither side wishes to move for summary judgment, the parties must propose a trial schedule by the same date.   Upon a joint request, the Court is happy to refer the parties for a settlement conference.

**SO ORDERED.**

**Date:  March 30, 2020**
**      New York, New York**

**VALERIE CAPRONI**
**United States District Judge**